Glenn S. PASSMAN, Petitioner-Appellant,

v.

Frank BLACKBURN, Warden, Respondent-Appellee.

No. 79–3802.

United States Court of Appeals, Fifth Circuit. Unit A

Aug. 6, 1981.

---

Michael H. Ellis, New Orleans, La. (Court-appointed), John G. Gillon, Jr., New Orleans, La., for petitioner-appellant.

Abbott J. Reeves, Asst. Dist. Atty., Gretna, La., for respondent-appellee.

Before CHARLES CLARK and RANDALL, Circuit Judges, and SHARP *, District Judge.

SHARP, District Judge:

Petitioner, Glenn S. Passman, is a state prisoner confined at the Louisiana State Penitentiary, Angola, Louisiana. Passman was tried and convicted on July 12, 1976, in the Twenty-second Judicial District Court for the Parish of St. Tammany, of armed robbery. He was then sentenced to serve ninety-nine years at hard labor without benefit of parole, probation, or suspension of sentence. On direct appeal his conviction and sentence were affirmed by the Supreme Court of Louisiana in a published opinion, *State v. Passman*, 345 So.2d 874 (La.1977). Subsequently, petitioner sought habeas corpus relief in both the trial court and Supreme Court of Louisiana. The trial court's denial of petitioner's application was affirmed by the Supreme Court of Louisiana. *State ex rel. Passman v. Blackburn,* 362 So.2d 1390 (La.1978). Having raised each of the instant assignments of error before that court, petitioner has exhausted his state remedies. 28 U.S.C. § 2254(b); *Pedrero v. Wainwright,* 590 F.2d 1383 (5th Cir.), cert. den., 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). The transcript of proceedings in the state courts has been filed with this court and it has been thoroughly reviewed pursuant to *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

In his petition Glenn Passman alleges the following grounds as bases for relief:

1. No probable cause for arrest;

2. Denial of the right to counsel at "show-up" identification;

3. Suggestive and tainted identification;

4. Conviction obtained by use of evidence obtained pursuant to an unlawful arrest;

5. Refusal of the court to excuse a juror for cause;

6. Misconduct by the district attorney;

7. Prosecution error through eliciting credibility testimony from a state witness on direct examination;

8. Violation of sequestration order;

9. Denial of right to effective assistance of counsel;

10. Confiscation of legal material, denial of access to the courts and the right to prepare;

11. Denial of the right to compel attendance of a witness.

The events which form the basis of this conviction took place on May 26, 1974. At approximately 9:30 P.M. on that date two men gained entry to the Covington, Louisiana home of Mr. Pat O'Brien. Once inside one of the men produced a gun and demanded money. A struggle ensued in which the 80 year old Mr. O'Brien was beaten and received a gunshot wound. The intruders then began a search of the house, leaving Mr. O'Brien in the kitchen. In one

* District Judge for the Northern District of Indiana, sitting by designation.

of the rooms they discovered Mrs. O'Brien and Cara, the O'Brien's 16 year old daughter. Cara was forced to accompany one of the intruders into another room where she was sexually molested. The intruders then returned to the kitchen accompanied by Mrs. O'Brien and Cara. In the meantime Mr. O'Brien had been able to reach a .22 caliber rifle and he fired upon the intruders as they approached. The two men fled taking with them two handguns belonging to Mr. O'Brien at approximately 9:50 P.M. The O'Brien home was well lit throughout this episode. Neither of the men had any covering over their face. Subsequently, two men were identified as the intruders, Walter Burnette and the petitioner. Separate trials were conducted, one of which resulted in the conviction challenged here.

## I.

In ground one petitioner alleges that his arrest was not supported by probable cause and therefore was unlawful. Specifically, petitioner maintains that only a vague description of the perpetrators was given to the police on the night of the crime. Mrs. O'Brien and Cara had given a description of the two men to the sheriff's department, part of which was radioed to all of the police departments in the vicinity. The police radio bulletin from Covington was that a "tall, dark-complexioned, white male" was wanted in connection with an armed robbery there. (R. 269). Also, the St. Tammany Parish Sheriff's Office requested the Hammond, Louisiana police to stake out Glenn Passman's home. Officers Bosco and Raacke had only this information when they arrived at petitioner's home at 10:15 P.M. on the night of the crime. Approximately twenty-five minutes after the intruders left the O'Brien home Passman was handcuffed by Officers Bosco and Raacke at his home in Hammond and taken to the police station as part of the investigation of an armed robbery which had occurred twenty-five miles away in Covington, Louisiana. At this point in time, the above description was the only bit of information which the officers had to rely on.

Probable cause to arrest exists "where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that 'an offense has been or is being committed.'" *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1964), quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). Although more than mere "reasonable suspicion" is required, the arresting officer need not have in hand evidence sufficient to convict." *United States v. Rieves*, 584 F.2d 740, 745 (5th Cir. 1978). In determining probable cause "we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). The detention of a person need not be accompanied by formal words of arrest or station house booking in order to constitute an "arrest" requiring probable cause under the Fourth Amendment. *Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969); *United States v. Brunson*, 549 F.2d 348 (5th Cir. 1977). *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) teaches that under the Fourth Amendment whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person. *Id.*, at 16, 88 S.Ct. at 1877; *Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *United States v. Preston*, 608 F.2d 626 (5th Cir. 1979), *cert. den.*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). None of the parties here seriously contend that the seizure of the petitioner was less than an arrest. Having once been handcuffed and placed in a police car his freedom to choose whether or not to continue his encounter with the police had been extinguished. The information available to the arresting officers was not sufficient to warrant a reasonable person's belief that petitioner committed the offense or might have information

about its commission. The District Court's finding of no probable cause to arrest is fully supported.

■ Petitioner then contends in ground four that this arrest without probable cause invalidates the evidence acquired as an immediate and proximate result of that arrest as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Specifically, petitioner challenges as "fruits" the photographs taken of him on the night of the crime and the show up identification made by Cara O'Brien, also on the night of the crime. The exclusionary rule bars evidentiary fruit obtained "as a direct result" of an illegal search or seizure. However, its bar only extends from the "tree" to the "fruit" if the fruit is sufficiently connected to the illegal tree:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417.

■ Two photographs were taken of the petitioner after his initial arrest and prior to the time Cara O'Brien identified him at the Hammond Police Station on the night of the crime. He alleges that these photographs were fruits of his illegal arrest and should have been suppressed. The record reveals that the two photographs were not, in fact, introduced into evidence. The photographs were used during the investigation in a photographic spread and that use will be subsequently addressed. However, since the photographs were not introduced into evidence there is no basis for a "fruits" argument under *Wong Sun.*

■ Petitioner also contends that the crime-night identification by Cara O'Brien was a fruit of the illegal arrest. Cara O'Brien testified as to that identification on direct examination (R. 329–331). One form of insufficient connection between fruit and tree occurs if the derivative evidence has a source independent of the illegal seizure. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *United States v. Houltin,* 566 F.2d 1027, 1031 (5th Cir.), *cert. den.,* 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978). Cara O'Brien's recollection of the individual that assaulted her stemmed from her face to face contact with him, not the arrest of the petitioner. This live witness testimony is independent of the constitutional violation. See *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Brookins,* 614 F.2d 1037 (5th Cir. 1980). Cara O'Brien's identification testimony was not derived in fact from the illegal police action. Nor is this a situation where an illegal search is conducted to discover the witness. The Supreme Court has "declined to adopt a 'per se' or 'but for' rule that would make inadmissible any evidence, whether tangible or live witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060, citing *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). The basis of Cara O'Brien's testimony is her personal observation, the testimony does not derive from the illegal arrest. Therefore, the exclusionary rule of *Wong Sun* does not bar the admission of this identification, and it should not have been excluded for that reason.

■ In ground two petitioner contends that his Sixth Amendment rights were abridged by denial of counsel at the "show up" identification. The show up in question was the crime night identification by Cara O'Brien at the Hammond police station. The right to counsel does not attach until adversary proceedings have been initiated. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). The Supreme Court has indicated that this is a practical determination stat-

ing "when the government has committed itself to prosecute" and petitioner finds "himself faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law" then adversary proceedings have commenced. *Moore v. Illinois,* 434 U.S. 220, 228, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977); *quoting Kirby v. Illinois,* 406 U.S. at 689, 92 S.Ct. at 1882. This identification was made during the investigatory stage on the night of the crime prior to any commitment by the government to prosecute. In fact, petitioner was arrested on May 26, 1974 and not arraigned until October 29, 1974. However no issue has been raised in this regard. Nor does the accused have a right to have counsel present when the government conducts presentation of photographs to eyewitnesses for identification purposes. *Moore,* 434 U.S. at 227, n. 3, 98 S.Ct. at 464, n. 3; *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). Identifications made prior to initiation of adversary proceedings are scrutinized instead, in light of Fifth and Fourteenth Amendments' proscription against procedures which are unnecessarily suggestive and conducive to irreparable mistaken identification. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Therefore, petitioner's allegation of denial of the right to counsel is without merit.

## II.

█ In his tenth ground, petitioner alleges that his legal materials were confiscated, he was denied access to the court, and he was denied the right to prepare a defense. The basis of this allegation is the fact that the St. Tammany Parish Sheriff's Office had confiscated legal papers, research, and files from the petitioner two weeks before trial. Petitioner had been appointed co-counsel pro se to assist trial counsel in the preparation of his case. On March 23, 1976 petitioner's counsel secured from the United States District Court an order mandating the return of these documents which was apparently never complied with. However, the record reveals that petitioner was represented, at each and every

stage of his trial and appeals, by competent counsel. This confiscation of documents did not infringe upon his Sixth Amendment right to counsel or inhibit counsel's effectiveness. Ground ten does not rise to a constitutional level and is accordingly without merit.

In ground eleven petitioner alleged that the trial court violated his Sixth Amendment right to compulsory process by refusing to subpoena the prosecutor to testify at the hearing on the Motion to Suppress. Petitioner argues that the prosecutor had exculpatory evidence regarding the photographic identification made by Mr. and Mrs. O'Brien. The trial judge refused to have the prosecutor take the stand. The record indicated that the prosecutor had already responded to the defendant's motion for disclosure of exculpatory evidence and filed a supplemental answer (Mot. to Supp., R. 4–10).

█ The Sixth Amendment right to compulsory process to assure the presence of witnesses is applicable to the states through the Fourteenth Amendment. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, that right is not absolute and the state may require a showing of some colorable need for the person to be summoned lest the right be abused. *Hoskins v. Wainwright,* 440 F.2d 69, 71 (5th Cir. 1971). Nor is there any allegation that the prosecutor deliberately hid favorable evidence or misplaced evidence inadvertently. In fact, petitioner's counsel concedes that the evidence sought by this route, the conflicting testimony of Sergeant Arthur and Mr. and Mrs. O'Brien regarding whether or not they identified anyone in the photo array, came out in the examination of these witnesses. There is no showing of any fundamental unfairness which violated petitioner's due process rights. The failure of the trial judge to enforce the subpoena does not rise to a constitutional dimension. Therefore, this allegation is without merit.

Petitioner's ground five alleges that the trial court erred in its failure to excuse a juror for cause thereby requiring petitioner to exhaust his preemptory challenges prior to the completed selection of the jury. The basis of the complaint is that a prospective juror, when asked whether he would be influenced by petitioner's possible refusal to take the stand, stated he "believed" he would be impartial under those circumstances. Disqualification of a juror is within the discretion of the trial judge. The constitutional standard of fairness requires that a defendant have "a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). To rise to a constitutional dimension on habeas corpus the basis for disqualification must be so prejudicial as to deprive the petitioner of due process. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); opinion below 495 F.2d 553, 556 (5th Cir. 1974); *Snyder v. Coiner*, 510 F.2d 224 (4th Cir. 1975). In light of this juror's scant response, there was no violation of fundamental fairness. This ruling of the state trial court does not rise to constitutional dimensions. Accordingly, this ground is without merit.

In his next assignment, ground six, petitioner alleges prosecutorial misconduct rendered his trial fundamentally unfair. In a 28 U.S.C. § 2254 proceeding the scope of review is a narrow one. This court does not sit as a super state supreme court to review errors under state law governing the limits of permissible argument. *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir. 1970), *cert. den.*, 400 U.S. 918, 91 S.Ct. 179, 27 L.Ed.2d 157 (1970). Nor may we impose upon state prosecutors the standards we apply to federal prosecutors in the exercise of our supervisory powers over the district courts. The standard adopted by the Supreme Court for evaluating the alleged misconduct requires a determination whether the prosecutor's acts were so prejudicial as to render a trial fundamentally unfair in violation of the due process clause. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Easter v. Estelle*, 609 F.2d 756 (5th Cir. 1980). This must be distinguished from conduct which is universally improper but not a denial of due process. *Easter, supra*, at 760. Further, not every trial error or infirmity which might on direct appeal call for application of our supervisory powers correspondingly constitutes a denial of due process necessary to support granting habeas corpus relief. *Donnelly, supra*, 416 U.S., at 642–43, 94 S.Ct., at 1871; *Cobb v. Wainwright*, 609 F.2d 754 (5th Cir.), *cert. den.*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). It is well established that in reviewing prosecutorial comment for possible prejudice they must be evaluated in the context of the trial as a whole. *Donnelly, supra*, 416 U.S., at 643–47, 94 S.Ct., at 1871–73; *Cobb, supra*, at 775 n.1.

Petitioner complains of the following examples of prosecution conduct:

1. The prosecutor's cross-examination of Mr. Burris (R. 578–579), suggesting to the witness that the prosecutor has reason to believe the witness is lying where no prior testimony indicated such a belief should exist, ("Now I am putting you on your guard, Mr. Burris.");

2. The prosecutor's cross-examination of Mrs. Rhonda Passman and comments to the Court and defense counsel (R. 591–592), ("my voice is my business and not his.");

3. The prosecutor's claim that the defense witnesses were lying (R. 633), ("We will see they were not all telling the truth . . . ");

4. The prosecutor personally vouching for the testimony of a State witness (R. 677–684), ("Again, I say to you, I will stake my case on the identification of Cara O'Brien".) And ("I will go you one better than that, I will stake my case on Cara O'Brien's identification.").

An examination of the entire record of proceedings fails to reveal that any prejudice resulted from the comments complained of. Under the circumstances reflected by the record in this case, the conclusion is clear

that the prosecutional remarks quoted above did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. See *Houston v. Estelle*, 569 F.2d 372, 382, 384 (5th Cir. 1978). While these improper remarks were not so prejudicial as to deny the petitioner due process, the conduct of the prosecutor so closely borders on impropriety as to deserve criticism. Therefore, petitioner's sixth ground is without merit.

Petitioner's seventh ground is that the trial court erred in allowing the prosecutor to elicit, on direct examination, testimony to establish the credibility of his own witness. The challenged colloquy involved an effort by the prosecutor to establish that Mr. O'Brien's vision was acute, and his identification therefore reliable, despite his advanced age. (R. 292–293). The petitioner asserts that the challenged testimony was admitted in violation of state evidentiary rule LSA–R.S. 15:484, which provided that a party has no right to assert a witness' credibility until that credibility is challenged.

■ The Fifth Circuit's resistance to challenge to evidentiary matters by habeas is firmly established. *Woods v. Estelle*, 547 F.2d 269, 271 (5th Cir.), *cert. den.*, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977). A violation of state evidentiary rules will not in and of itself invoke federal habeas corpus relief. *Bryson v. Alabama*, 634 F.2d 862 (5th Cir., 1981). The violation must be of such a magnitude as to constitute a denial of "fundamental fairness". *Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir. 1980). As a guideline to applying its criterion, this circuit has repeatedly stated that the erroneous admission of evidence can justify habeas corpus relief only if the error was "material in the sense of a crucial, critical, highly significant factor." *Bryson, supra*, at 865, citing *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.), *cert. den. sub nom.*, *Hills v. Maggio*, 429 U.S. 850, 97 S.Ct. 850, 50 L.Ed.2d 124 (1976). Mr. O'Brien's testimony was that the petitioner sat right next to him at the kitchen table and had a conversation prior to the announcement that this was a holdup. (R. 280–283). Mr. O'Brien further testified that he could see better at a distance than up close and that he didn't remember if he had his glasses on when he encountered the intruders. (R. 292). He also stated that there were no restrictions on his driver's license and that he could shoot without any problem. (R. 292).

■ This evidence goes to the strength of Mr. O'Brien's identification of his assailants. The prosecutor's attempted bolstering of his witness' credibility and the witness' responses are not crucial, critical, highly significant factors in the case. These remarks do not rise to the constitutional magnitude of a denial of fundamental fairness. Therefore, this ground is without merit.

In ground nine petitioner contends he was denied his right to effective assistance of counsel. As a basis the petitioner states only that he was shackled during the hearing on the motion to suppress and during the motion for a new trial and that this severely restricted his ability to assist in his own defense. This circuit in *McKenna v. Ellis*, 280 F.2d 592 (5th Cir. 1960), modified, 289 F.2d 928, *cert. den.*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961), adopted a standard for effective assistance which states that a party must be represented by "counsel reasonably likely to render and rendering reasonably effective assistance." *Easter, supra*, at 759.

■ It must be noted that none of the proceedings at which petitioner was shackled were before the jury. Thus, petitioner suffered no prejudice by exposure to the jury. On each occasion counsel moved that the petitioner be unshackled and each time the trial judge denied the motion. The degree of security exercised over the person of the defendant is within the trial judge's discretion. *State v. Spencer*, 257 La. 672, 243 So.2d 793 (1971); *Hardin v. United States*, 324 F.2d 553 (5th Cir. 1963). The decision to shackle a defendant lies within that discretion and will not be overturned unless abused. *Hardin v. Estelle*, 365 F.Supp. 39, 45–47 (W.D.Tex.), *aff'd* on other grounds, 484 F.2d 944 (5th Cir. 1973).

Defense counsel's timely objections indicate comprehension of the situation. This conduct provides no basis for a claim of ineffective assistance of counsel.

■ Petitioner advances as ground eight the contention that the trial court violated its own sequestration rule by failing to exclude the testimony of a witness who allegedly violated the sequestration order. Petitioner complains that Mrs. O'Brien and her daughter, Cara, discussed the case the night before Mrs. O'Brien was scheduled to testify. The record reveals that Mrs. O'Brien and Cara, who had testified, spoke of nothing other than the fact that queries had been directed concerning petitioner's mustache. (R. 464). There is no evidence in the record that Mrs. O'Brien was prompted or coached by Cara concerning her testimony. And there is ample evidence in the record indicating defense counsel's efforts to impeach Mrs. O'Brien's testimony, including, among other ways, mention of her conversation with Cara. That the jury chose to believe her is not a question of constitutional dimensions. Additionally, the state court's failure to follow its own procedural rules does not of itself raise federal constitutional questions cognizable in habeas corpus. 28 U.S.C. § 2254; *Van Poyck v. Wainwright*, 595 F.2d 1083 (5th Cir. 1979). Petitioner's eighth ground fails to state a grievance of constitutional magnitude and is, therefore, without merit.

### III.

Finally, petitioner's ground three alleges that the identifications made of him were suggestive and tainted. All of the victims, Mr. and Mrs. O'Brien and Cara O'Brien, identified the petitioner as one of their assailants. Mr. and Mrs. O'Brien testified that they identified the petitioner in a photo array, at a lineup and made an in-court identification. Cara O'Brien testified that she identified the petitioner at a show up, at a lineup and made an in-court identification.[1]

■ In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court set forth a two prong test for the exclusion of identifications based on impermissibly suggestive photo arrays. The first prong of the analysis is the determination of whether the identification procedure was impermissibly suggestive. If it is not, the inquiry ends. If it is, a separate inquiry must be made as to whether under the totality of the circumstances the suggestiveness leads to a substantial likelihood of irreparable misidentification. It is upon this dual finding that the claim of a denial of due process rests.[2] In evaluating this complaint we have the guidance of substantial precedent.[3] Under this analysis "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Thus, an identification found to be reliable will be admitted even though the confrontation procedure was suggestive.

■ The factors to be considered in evaluating the reliability of an identifica-

---

1. There has been no challenge here to any of the in-court identifications made of the petitioner. The question of whether the in-court identifications had a basis independent of the suggestive observations was not raised. See *Manson v. Brathwaite*, 432 U.S. 98, 106, n. 9, 97 S.Ct. 2243, 2249, n. 9, 53 L.Ed.2d 140 (1977); *United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967); *Allen v. Estelle*, 568 F.2d 1108, 1114 (5th Cir. 1978).

2. The decisions of this circuit establishing the bipartite inquiry developed first in the area of photographic confrontations. It has been recognized that this two tier formulation is equally applicable to situations where other types of confrontation have been utilized. *Preacher v.*

*Estelle*, 626 F.2d 1222 (5th Cir. 1980); *Allen, supra*, at 1111, n. 5. This view is consistent with that espoused by the Supreme Court. See *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and cases cited therein.

3. *Hudson v. Blackburn*, 601 F.2d 785 (5th Cir. 1979), *cert. den.*, 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 772 (1980); *United States v. Williams*, 592 F.2d 1277 (5th Cir. 1979); *Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1978); *United States v. Smith*, 546 F.2d 1275 (5th Cir. 1978); *Bloodworth v. Hopper*, 539 F.2d 1382 (5th Cir. 1976).

tion were enumerated in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and reaffirmed in *Manson, supra*, 432 U.S., at 114, 97 S.Ct., at 2253. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* Against these factors is to be weighted the corrupting effect of the identification itself. *Manson, supra*, at 114, 97 S.Ct., at 2253.

With this analytic framework in mind let us turn to examine the identifications made by Mr. and Mrs. O'Brien. Some factual background is necessary. On the night of his arrest, May 26, 1974, a color photograph was taken of the petitioner by police (R. 557). On June 4, 1974, nine days later, Sergeant Arthur of the St. Tammany Parish Sheriff's Office took that *color* photograph of petitioner and eleven black and white mug shots to the hospital room of Mr. O'Brien. Once there Sergeant Arthur displayed this photo array to Mr. and Mrs. O'Brien to determine if they could identify one of the twelve persons pictured as their assailant. (R. 536). At the motion to suppress and at trial Sergeant Arthur testified that neither Mr. nor Mrs. O'Brien was able to make a positive identification of any of the persons pictured. (R. 537–540). At the hearing on the motion to suppress both testified they did not identify anyone from the photo array shown to them at the hospital. (Mot. to Supp., R. 108, 121 respectively). However, at trial Mr. and Mrs. O'Brien testified that they had picked the petitioner out of the photo array shown to them that day at the hospital. (R. 290, 452 respectively). Both admitted making contrary statements at prior proceedings when cross-examined.

There is a further intervening event which must be noted. After Mr. O'Brien was released from the hospital he heard that the suspect in the armed robbery of his home would be arraigned on October 29, 1974. On his own initiative Mr. O'Brien, accompanied by his wife and daughter, attended the arraignment of petitioner. (R. 332). The record reveals that the O'Briens were in court about ten minutes while the petitioner was present before the prosecutor realized their attendance and asked them to leave. (R. 288). Mr. and Mrs. O'Brien testified that no one pointed the petitioner out to them. (R. 287, 438 respectively). However, it was the testimony of Cara O'Brien, who had previously identified petitioner at a show up, that she pointed out the petitioner to her parents. (R. 332–333). Approximately a month later all of the O'Briens were able to pick the petitioner out of a lineup.

■ We must conclude that the photographic identification procedure employed in this case was impermissibly suggestive. The use of a single color photograph, front view, with eleven other black and white mug shots, front and side views, carried an inherent suggestivity. Further, only eight of the photographs, including the color photo, were the same size. Four of the photographs were significantly smaller. This color photograph of the petitioner stood out like the proverbial "sore thumb." Such a procedure is impermissibly suggestive.

■ Having found the identification procedure to be impermissibly suggestive it now becomes necessary to determine the reliability of this identification. We turn then to the facts of this case and apply the analysis first to Mr. O'Brien's identification.

1. The opportunity to view. Mr. O'Brien sat two and one-half feet from the intruder at his kitchen table with the kitchen light on. The intruder wore nothing over his face nor was there anything to obstruct the view of his face. (Mot. to Supp., R. 116, R. 291). This view at the kitchen table lasted five or six minutes.

2. The degree of attention. Mr. O'Brien's attention was focused on the intruder and on his telephone book where he was looking for a number of a towing service. However, his attention was drawn to his immediate surroundings when the other intruder put a gun to his head and an-

nounced this was a holdup. At that point he observed the intruder sitting at the table with him, reach across the table and pick up Mr. O'Brien's gun which had set there. At this point Mr. O'Brien was led through the house and questioned about who was in the house and where the wall safe was. (R. 282). During this conversation the intruder stood right beside Mr. O'Brien so he could be plainly seen. (R. 282). All of this conversation was a continuing opportunity to observe the intruders. And quite naturally the person asking the questions is the focus of one's attention, particularly when one's life is being threatened.

3. The accuracy of the description. Due to the fact that Mr. O'Brien was beaten and shot in this robbery and then taken to the hospital there is no record of him having given any description of his attackers.

4. The witness' level of certainty. There is conflicting evidence as to Mr. O'Brien's certainty of identification. At the hearing on the motion to suppress he testified he did not pick anyone out of the photo array. However, at the separate trial of the co-defendant he testified that he picked out both Burnette and the petitioner from the photo array (R. 311). Mr. O'Brien did pick the petitioner out of an uncontested lineup but this did not occur until after he had attended petitioner's arraignment and viewed petitioner there alone and unobstructed. (R. 287).

5. The time between the crime and the confrontation. The presentation of the photo array took place nine days after the robbery and no identification was made according to the trained police officer Sergeant Arthur, whose purpose was to determine if the O'Briens could identify someone in the photo array. The trial and in-court identification, coupled with the conflicting testimony that Mr. O'Brien had identified petitioner from a photo array, occurred more than two years after the date of the crime.

Undoubtedly, these indicia of reliability are conflicting. However, Mr. O'Brien was able to describe each man's role in the crime with great particularity. He had a lengthy opportunity to view these intruders and his attention was naturally focused on the one who spoke to him and threatened him. Further, all of this conflicting evidence was brought out skillfully on cross-examination by counsel for the defense and the jury weighed this identification testimony and made its decision. Therefore, in the totality of the circumstances, despite the impermissibly suggestive procedure, we cannot say that there is a very substantial likelihood of irreparable misidentification. Some element of untrustworthiness is customary grist for the jury mill.

We next turn to the identification made by Mrs. O'Brien. Mrs. O'Brien viewed the same photo array on June 4, 1974 in her husband's hospital room as Mr. O'Brien did. The prior conclusion that the procedure used was impermissibly suggestive also applies to Mrs. O'Brien's testimony concerning the identification from the photo array. The factual background of this identification must begin at the hearing on the motion to suppress. At the hearing on the motion to suppress Mrs. O'Brien testified that she did not identify anyone from the photo array at the hospital (Mot. to Supp., R. 121). Sergeant Arthur, the officer presenting the array, also testified that Mrs. O'Brien failed to identify any individual from the photo array as one of the intruders (Mot. to Supp., R. 135). However, at trial Mrs. O'Brien testified that she had identified the petitioner from the photo array at the hospital. (R. 435). She also testified that she had seen the petitioner at his arraignment and that no one had pointed him out to her there. (R. 437–438). Cara O'Brien testified that she pointed the petitioner out to her parents. (R. 333). Mrs. O'Brien left the arraignment with her husband when asked. Subsequently, Mrs. O'Brien picked the petitioner out of a lineup. We turn now to the facts of this case and apply the analysis to determine what indicia of reliability this identification has.

1. The opportunity to view. Mrs. O'Brien was asleep when this robbery commenced. She was awakened by her daughter who was being held by one of the in-

truders with a gun to her head. (R. 432). Mrs. O'Brien got up and was taken down the hall towards the kitchen. The lights were on in the bedroom and in the hallway. (R. 433). Mrs. O'Brien stood next to, or on the side of, the intruder the whole time. She testified that nothing obstructed her view of his face and that she could see him plainly. (R. 433). It was at this point that Mr. O'Brien started shooting and the intruders fled. Mrs. O'Brien had an ample opportunity to view the intruder's face as she was in his presence fifteen or twenty minutes. (R. 435).

2. The degree of attention. Mrs. O'Brien awoke to see a man standing next to her daughter with a gun. The stranger told her to get up, which she did. Her attention would naturally focus on the person who was speaking to her and threatening her child. She was not a disinterested bystander.

3. The accuracy of the description. On the night of the crime Mrs. O'Brien gave only the briefest description of the intruders; one, short with a crew cut, two, tall with a dark complexion. (R. 468). She was admittedly shaken on that night (R. 459) and testified at trial that she now would not consider the petitioner dark complected but pale instead. (R. 470).

4. The witness' level of certainty. Mrs. O'Brien's level of certainty is variable. As previously noted she first testified that she did not identify anyone from the photo array. At trial that testimony became that she was certain she had identified the petitioner from the photo array. Mrs. O'Brien did pick the petitioner out of an uncontested lineup. However, the lineup occurred after the viewing of the arraignment.

5. The time between the crime and the confrontation. The time lapsed between the crime and the photo array at the hospital was nine days. The trial occurred more than two years after the crime.

It must be noted that this conflicting testimony was skillfully brought out on cross-examination of Mrs. O'Brien by defense counsel. The jury weighed this conflicting testimony and made its decision.

Undoubtedly, the indicia of reliability here conflict. However, there are several countervailing factors which militate against any substantial likelihood of irreparable misidentification. First, the intruders wore no covering over their face in a well lighted home. Second, the intruders were undoubtedly the center of attention holding the witness at gunpoint while asking questions. Finally, this course of events lasted twenty or twenty-five minutes. In these two identifications the time delay is a serious negative factor. See *Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972). At no time however, did Mrs. O'Brien ever pick out anyone else as her assailant. Therefore, in the totality of the circumstances, despite the impermissibly suggestive procedure, we cannot say that there is a very substantial likelihood of irreparable misidentification.

The final identification challenged in this petition was made by Cara O'Brien. On the night of the crime petitioner was arrested and taken to the Hammond Police Department headquarters. Cara O'Brien was then taken to the Hammond Police Department headquarters too. During the ride from her home in Covington to Hammond Cara O'Brien cried intermittently as she was still quite upset, by her own admission. (R. 520). During the ride to Hammond the officers informed her that they were going to see if she could identify a suspect as one of the robbers of her home. Cara O'Brien was with two police officers from the St. Tammany Parish Sheriff's Department and a Mrs. Luce, a friend of her family. Upon their arrival at the Hammond police station, Officer Bosco met Cara O'Brien and her party outside the Hammond police station. At this point Bosco testified that he told Captain Laird, one of the officers with Cara O'Brien that "he [Passman] was in that room". (R. 546, 548). Bosco testified that Cara O'Brien was with this group when he made this remark. Cara O'Brien testified that she remained in the police car until called and did not hear this. Regardless, Cara O'Brien and the officers accompanying her then walked past the entrance to

the building toward the window indicated by Bosco which was about six feet past the door. (R. 549). Cara O'Brien looked in this window and saw the petitioner seated, facing the window, being interrogated by one uniformed officer and four or five plain clothes officers. When Cara O'Brien saw Passman she identified him as the man who was at her house earlier that evening and sexually molested her. (Mot. to Supp., R. 51–52, 58, R. 511). The officers conducting the investigation stated that no lineup was planned at that time.

Cara O'Brien was then sent back to the police car to await the return to Covington. Shortly thereafter, a uniformed officer brought petitioner out of the station handcuffed within plain view of Cara O'Brien. She then reiterated her opinion that this was the man who had been at her home. (R. 329–330). Cara O'Brien then attended the arraignment with her parents. Her testimony is that she pointed the petitioner out to her parents during the approximately ten minutes they were there. (R. 333). Subsequently, Cara O'Brien picked the petitioner out at an uncontested lineup.

The standard for judging this show up is the same as previously applied herein. A due process violation occurs when, under the totality of the circumstances, a confrontation procedure is so unnecessarily suggestive as to give rise to substantial likelihood of irreparable misidentification. *Stovall v. Denno*, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). The same bipartite analysis is applied.

Here the repeated show up at the Hammond police station was alone highly suggestive. It is an understatement to say that "the practice of showing suspects singly to persons for the purpose of identification, ..., has been widely condemned." *Stovall, supra,* at 302, 87 S.Ct. at 1972; *Allen, supra,* at 1111; *Frank v. Blackburn*, 605 F.2d 910 (5th Cir. 1979). As must always be the case, the police should have made an effort to construct a lineup. Here Cara O'Brien was told a suspect was in custody and saw the petitioner in a room, fortuitously facing out the window, being interrogated by a uniformed police officer.

These circumstances served to unduly focus the emotionally upset Cara O'Brien on the petitioner. Nor are any exigent circumstances put forward in support of a show up identification procedure. Accordingly, this court is compelled to find that this identification procedure was impermissibly suggestive.

The court must now consider what indicia of reliability this identification contains. We turn then to the facts of this case and apply the analysis.

1. The opportunity to view. Cara O'Brien was studying in her room when the robbery began. Then one of the intruders came to her room and ordered her to accompany him. The lights were on in her room and in the hallway. Cara O'Brien testified she walked right up to the intruder, the whole time looking him straight in the face. (R. 323). She was then forced to accompany this man into the game room where he sexually molested her. The record indicates that while the game room light was not on, the room was illuminated by the hall light. Cara O'Brien had an opportunity to view her assailant at close quarters for an extended length of time.

2. The degree of attention. This is not a case where any of the witnesses are casual bystanders. Cara O'Brien was physically mistreated and threatened with death if she did not cooperate. Quite naturally her assailant would be the focus of her attention. The court also notes the high degree of detailed testimony about what exactly happened to her. This testimony evidences a high degree of attention.

3. The accuracy of the description. Before her transportation to Hammond on the night of the crime, Cara O'Brien gave a detailed description. That description was "white male, approximately 24 or 25 years old, five foot nine to six feet tall, blonde medium length hair, wearing a bandana on his hair, and blue jeans. (R. 393–394). The detail of this description indicates also a high degree of attention. This description substantially fits the petitioner's appearance.

4. Witness' level of certainty. Cara O'Brien immediately picked the petitioner

as her assailant when she saw him on the night of the crime in Hammond. When asked if she was certain, Cara O'Brien stated she was. There were other men in the room with the petitioner, however, he was the only one seated facing the window. Cara O'Brien has never identified anyone else as her assailant.

5. The time between the crime and the confrontation. There was only a delay of about two hours from the time the robbers left the O'Brien home to when Cara O'Brien made the show up identification in Hammond. We do not have here the passage of a substantial amount of time which could affect the reliability of the identification. Her memory was still fresh.

Consequently, although the show up confrontation was impermissibly suggestive, these indicia of Cara O'Brien's ability to make an accurate identification are not outweighed by the corrupting effect of the show up. Therefore, in the totality of the circumstances, despite the impermissibly suggestive procedure, we cannot say there is a very substantial likelihood of irreparable misidentification.

In light of all the foregoing, the decision of the district court was correct. AFFIRMED.