ROSENBAUM, Circuit Judge,
concurring:
Johnny Marshall has already spent seventeen years in jail for a $261 robbery that he very well may not have committed. And after our decision today, he may spend the rest of his life there. But Marshall’s attorney almost certainly could have prevented Marshall’s conviction, had he done what any other competent attorney would have on this record: pursued a motion to suppress the illegally obtained sole eye-witness’s identification of Marshall, an identification that the same witness’s earlier description of Marshall squarely contradicted.
I write separately because I believe that Marshall was denied effective assistance of counsel, in violation of the Sixth Amendment. Nevertheless, despite the weak evidence underlying Marshall’s conviction and the substantial error his trial counsel made, I agree with the Majority’s ultimate conclusion that 28 U.S.C. § 2254 offers Marshall no relief. Whether because of § 2254’s strict statutory exhaustion requirements or its highly deferential standard of review of state-court decisions, we have no choice but to deny Marshall’s claim. At this point, any potential relief Marshall might obtain must come from the state, such as an act of clemency by the state’s executive branch.
*1291 I.
Thin. That’s a generous way to describe the evidence against Marshall. The only evidence tying Marshall to the robbery consists of Geraldine Jenkins’s identification of him. But Jenkins — the Pizza Hut employee who was present during the robbery — identified Marshall within about an hour of providing a description of the robber that bore about as much resemblance to Marshall’s actual appearance as broccoli does to carrots. Both are in the same general category — men and vegetables, respectively — but that’s where the similarities end.
Jenkins said the robber was roughly 5'4" and weighed about 115 pounds, but Marshall is 5'8" and weighed no less than 178 pounds at the time of the robbery. Even setting aside the difference in height, Jenkins described a man who, by- objective standards, would have been underweight, but Marshall was, in fact, overweight by objective standards when the robbery occurred.[1]
The discrepancies between Jenkins’s description of the robber and Marshall’s actual appearance did not end there. Jenkins characterized the robber as a dark-complexioned black man, but Marshall has a light complexion; Jenkins estimated that the robber was about 22 years old, but Marshall was 31 at the time; Jenkins characterized the robber’s teeth as “normal,” but Marshall has an overbite and “very crooked teeth that are immediately obvious as soon as you look at his teeth when he opens his mouth.” Jenkins reported that the robber wore a white painter’s cap, but Marshall neither wore nor was found with a white hat of any type or a painter’s cap of any color.
During her testimony, Jenkins insisted that the robber’s shirt had a word written in white letters on the left shoulder, but Marshall was shirtless when he was found, and neither of the two shirts discovered with him had writing on the shoulder. In fact, Jenkins expressly denied that the robber wore either of the shirts recovered with Marshall.
Jenkins said the robber showed her a gun with a black handle and a “brown trim plate,” but Marshall had no gun with him when he was found; Jenkins stated that she gave the robber about $260, but Marshall did not have the stolen money when he was found; and Jenkins recalled that no vehicle was waiting for the robber outside the store, but Marshall was in his truck when law enforcement encountered him.
Not only did officers fail to find the hat, shirt, gun, and money with Marshall, but hours of scouring the entire area within a one-block perimeter of where Marshall was found — including with the aid of a police K-9 unit — did not turn up any of these items or any other evidence linking Marshall to the robbery in any way. So the facts about Marshall and what was found — or more accurately, not found — in his possession paint a stark contrast from Jenkins’s detailed description of the robber. And they do so even though Jenkins *1292 had learned before the robbery to take notice of “all the details” about any robber’s appearance that she could, such as the height, weight, and distinguishing features; the store was brightly lit when the robbery occurred; and only roughly a two-foot counter separated Jenkins from the robber. Significantly, Jenkins’s problematic identification of Marshall was the only direct evidence entered against him at trial.[2]
II.
Jenkins identified Marshall three times: (1) on the night of the robbery, after the officer drove Marshall from where his truck was found to the Pizza Hut; (2) about five months after the robbery, from a photographic lineup containing a picture of Marshall wearing exactly the same thing he wore when Jenkins identified him on the night of the robbery; and (3) in court during the trial, when Marshall was the only one other than counsel sitting at the defendant’s table.
With respect to the first identification, upon learning that he was to be transported to the Pizza Hut, Marshall put on a purple t-shirt that was found in his truck. Then law enforcement handcuffed Marshall and his colleague, Ben Ivey, behind their backs, while they were at the location where Marshall’s truck was found, and an officer put the two men into his car. The officer drove Marshall and Ivey to the robbed Pizza Hut. Once they arrived, the officer brought Jenkins to the back door of his car, where Marshall and Ivey were handcuffed inside, sitting behind a partition separating the rear seat from the front seat. Since, by this point, it was around midnight and dark, the officer shined his flashlight through the car window and on the men. By flashlight light and through a window, Jenkins identified Marshall, who was sitting next to the door where Jenkins was standing. As a result of Jenkins’s identification, law enforcement arrested Marshall for the robbery.
Five months after the robbery, on November 18,1998, Jenkins went to the State Attorney’s Office and reviewed a color photo lineup of twelve men. Included in the lineup was a picture of Marshall in his purple t-shirt, taken on the night of the robbery. Even setting aside the obvious taint that likely came from the fact that Jenkins had seen Marshall’s face in the back of the police car on the night of the robbery, only one other man in the lineup wore a purple shirt, but his shirt was a .turtleneck — a piece of clothing that would never be worn outside in Florida in the middle of June, when the robbery oc *1293 curred. Not surprisingly, Jenkins identified Marshall.
Finally, the last identification occurred in court during Marshall’s testimony. Of course, during trial, Marshall — the sole defendant — sat at the defense table .with only his lawyer during the trial. When asked to identify the robber, Jenkins pointed to Marshall and said, “That man right there beside [his lawyer].” Between Marshall’s status as the only other person at the defense table and the fact that, by this time, Jenkins had twice previously been shown Marshall’s face, Jenkins’s in-court identification of Marshall was about as unexpected as the mention of Voldemort in a Harry Potter novel.
These contradicted identifications are the sole evidence tying Marshall to the robbery.
III.
And they could have been suppressed under Florida law. Section 901.151, Fla. Stat.[3] — a law that has been on Florida’s books since 1969 — prohibits a Terry stop[4] from extending “beyond the place where it was first effected or the immediate vicinity thereof,” upon penalty of exclusion of any evidence resulting from a violation.[5] Under *1294 the plain language of this statute, “an investigatory stop may not extend beyond the place of the initial encounter.” Kollmer v. State, 977 So.2d 712, 715 (Fla. Dist. Ct. App. 2008) (citing Saturnino-Boudet v. State, 682 So.2d 188, 193 (Fla. Dist. Ct. App. 1996); Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); Dunaway v. New York, 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). Though Kollmer referred in 2008 to this interpretation as “well settled,” it relied on a 1996 Florida District Court of Appeal case for that proposition. See id., of course, predates the robbery that occurred in Marshall’s case.
In Kollmer, the defendant was found in a yard, after having run through some woods in escaping from the crime scene. 977 So.2d at 713-14. An officer transported the defendant back to the crime scene for identification by the victim. Id. at 714. Though the Florida appellate court found the initial stop to be lawful, it concluded that the transportation of the defendant violated Fla. Stat. § 901.151(3). Id. at 715. So the court suppressed the resulting identification. Id. Indeed, Florida courts have interpreted § 910.151(3) as prohibiting the transportation of a defendant without probable cause, beyond a short distance that would be reasonably walkable.[6] See, e.g., Griggs v. State, 994 So.2d 1198, 1201 (Fla. Dist. Ct. App. 2008) (transportation of defendant from the crime scene to the police station was outside the “immediate vicinity” and violated § 901.151(3)); United States v. Hannah, 98 So.3d 226, 228 (Fla. Dist. Ct. App. 2012) (transportation of defendant “two houses down to the crime scene” fell within the “immediate vicinity”).
For these reasons, Section 901.151(3) prohibits the type of transportation that occurred in Marshall’s case. Just like in Kollmer’s case, in the absence of probable cause, law enforcement transported Marshall by police car about a mile away, to the scene of the crime — well beyond the “place of the initial encounter.” Kollmer, 977 So.2d at 715. As a result, also as in Kollmer’s case, the identification of Marshall following his illegal transportation to the scene of the crime was inadmissible under § 901.151(6).[7]
IV.
By failing to seek to suppress Jenkins’s identification of Marshall, trial counsel rendered ineffective assistance in violation of the Sixth Amendment. The Supreme Court established the standard for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under that case, a petitioner must establish both deficient performance and resulting prejudice in order to set forth a successful claim. Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). Trial counsel’s failure to file a suppression motion under the circumstances in Marshall’s case easily satisfies both.
*1295 To show deficient performance, a petitioner must establish that his counsel’s representation “fell below an objective standard of reasonableness.” Strickland, 466 U.S. at 687-88, 104 S.Ct. at 2064. We evaluate counsel’s performance by considering whether it was reasonable “under prevailing professional norms.” Hinton v. Alabama, — U.S. -, 134 S.Ct. 1081, 1088, 188 L.Ed.2d 1 (2014) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2052) (internal quotation marks omitted). While “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,” Strickland, 466 U.S. at 690, 104 S.Ct. at 2052, decisions made based on a lawyer’s unreasonable mistake of law constitute deficient performance. Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986). As the Supreme Court has explained, “An attorney’s ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland.” Hinton, 134 S.Ct. at 1089 (citing Williams v. Taylor, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Kimmelman, 477 U.S. at 385, 106 S.Ct. at 2588).
Here, counsel’s failure to file a suppression motion occurred not as a matter of strategy, but rather, as a matter of ignorance. Had counsel performed basic research, he would have known that Florida law supported suppression under the facts of Marshall’s case. True, counsel attempted to couch his failure to pursue a pretrial suppression motion as a matter of strategy. Specifically, counsel testified during the evidentiary hearing on Marshall’s Rule 3.850, Fla. R. Crim. P., motion that he chose not to pursue a written pretrial suppression motion “because it was a waste of time, and [he] could do it just as effectively at trial.”
But counsel never objected at trial to the admissibility of Jenkins’s robbery-night identification of Marshall. So even assuming, arguendo, that foregoing a pretrial suppression motion for the convenience of an in-trial objection constituted a reasonable strategy, counsel did not employ it in Marshall’s case. And counsel repeatedly insisted (incorrectly) at the Rule 3.850 hearing that Florida law foreclosed the possibility of a successful suppression motion in Marshall’s case. Counsel even effectively admitted that he was not familiar with the contents of Fla. Stat. § 901.151(3). Considering that the law had been ■ in effect since 1969 and was last amended more than a year before Marshall’s trial, basic research would have revealed the law’s existence, and by objective standards, any reasonably competent attorney would have sought exclusion of the identification as the fruit of a violation of § 901.151(3). Marshall’s trial counsel’s failure to do so was necessarily deficient performance under Strickland.
Counsel’s error was also highly prejudicial. Strickland prejudice occurs when “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. A “reasonable probability,” in turn, “is a probability sufficient to undermine confidence in the outcome.” Id.
The error in this case epitomizes prejudice. Florida courts’ interpretation of Fla. Stat. § 901.151(3) shows that had counsel filed a suppression motion based on the violation of that provision, the motion would have stood a good chance of succeeding. If it had, under § 901.151(6), Jenkins’s robbery-night identification of Marshall would have been suppressed as a fruit of the violation of § 901.151(3). And Jenkins’s photospread identification likely would have been suppressed as well, considering the taint arising from the improp *1296 er robbery-night show-up identification, the fact that Marshall was wearing the same thing in the photo that he wore when Jenkins originally identified him, and the fact that he was the only one wearing a purple t-shirt in the 12-person photo-spread.
If these items were suppressed, that would have left only Jenkins’s in-court identification of Marshall. But even if the photospread identification were not suppressed, at best, the sole evidence tying Marshall to the crime would have been Jenkins’s photo identification five months after the robbery and her in-court identification of Marshall more than a year after the crime — both of which were squarely contradicted by Jenkins’s robbery-night description of the robber. Particularly in light of the evidence suggesting that Marshall was not the perpetrator — the fact that no gun, money, cap, or shirt with writing on the left shoulder were found at or within a one-block perimeter of Marshall, despite the use of a police K-9 and a multi-hour search — there is certainly a “reasonable probability that but for counsel’s [failure to file a suppression motion], the result of [Marshall’s trial] would have been different.” See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
Put simply, under Strickland and its progeny, counsel’s failure to file a suppression motion amounted to ineffective assistance of counsel, in violation of Marshall’s Sixth Amendment right to effective counsel.
V.
But, as a federal appellate court, we do not decide the merits of Marshall’s Strickland claim in the first instance. Instead, that is up to the Florida courts.
Title 18, United States Code, Section 2254 severely circumscribes our review of the Florida courts’ resolution of the claims of ineffective assistance brought before them. As relevant here, § 2254(b) statutorily demands the state-court exhaustion of any claim a petitioner may have before a federal court may, grant relief on that same claim. Under § 2254(b)’s exhaustion provisions, when a petitioner identifies an issue in his § 2254 motion that he did not raise or pursue in state court, we lack the discretion to grant relief on that claim.
And if a petitioner overcomes the exhaustion hurdle, under 18 U.S.C. § 2254(d), we must defer to the state court’s resolution of the prisoner’s habeas claims unless the state court’s decision “ ‘was contrary to’ federal law then clearly established in the holdings of [the Supreme Court] ...; or ... it ‘involved an unreasonable application of such law ...; or ... it ‘was based on an unreasonable determination of the facts’ in light of the record before the state court.” Harrington v. Richter, 562 U.S. 86, 100, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (citations omitted). When claims based on Strickland are at issue, such as in Marshall’s case, our review of the state court’s decision is “doubly deferential.” Burt v. Titlow, — U.S. -, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013). That is so because “judicial scrutiny of counsel’s performance must be highly deferential” under Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, and § 2254(d), by its terms, independently requires us to review state-court decisions deferentially. See Cullen v. Pinholster, 563 U.S. 170, 190, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011).
The Majority believes that Marshall failed to exhaust his state remedies .with respect to his claim that counsel was ineffective in violation of Strickland when he failed to file a motion to suppress premised on § 901.151(3) and (6). Though I respectfully disagree, it makes no difference to the outcome of Marshall’s case. Even if Marshall sufficiently exhausted his state-court remedies on the § 901.151 issue, he *1297 cannot show that the state court’s application of Strickland’s prejudice prong[8] was contrary to or involved an unreasonable application of federal law.
The state court found no prejudice because it concluded that even had a suppression motion been filed, it would have lacked a reasonable probability of success. I respectfully disagree with that conclusion, based on the plain language of § 901.151(3) and (6) and the Florida case-law construing it. But it really does not matter what I think because Florida courts are the arbiters of Florida law. And a Florida appellate court affirmed the state circuit court’s order. In any event, even if the Florida courts were mistaken, an unreasonable application of Florida law is not an unreasonable application of federal law. So it provides no basis for relief under § 2254(d).
VI.
This ease raises serious and troubling issues. Under the narrow scope of review that § 2254 imposes on federal courts, however, we are constrained to affirm the district court’s denial of relief. Marshall’s potential relief, if any, appears to lie in the hands of the state.

. According to the United States Department of Health and Human Services National Institutes of Health’s (“NIH”) body mass index ("BMI”) calculator, see http://www.nhlbi.nih. gov/health/educational/lose_wl/BMI/bmicaIc. htm (last visited July 1, 2016), a 5'4" person weighing 115 pounds has a BMI of 17.9, while a 5'8" person weighing 178 pounds has a BMI of 27.1. NIH’s website describes those with BMI scores "[b]elow 18.5” as "[underweight” and those with BMI scores between 25.0 and 29.9 as “[ojverweight” (those with scores between 18.5 and 24.9 are characterized as "[n]ormal”). http://www.nhlbi.nih.gov/ health/educational/lose_wt/risk.htm (last visited July 1, 2016). Though Jenkins stated that the robber had a “medium” build — a subjective description — her objective description described an underweight man. And, in any case, Jenkins did not describe an overweight man, like Marshall was.

. The only circumstantial evidence consisted of Marshall’s presence about a mile away from the Pizza Hut, roughly an hour after the robbery. But the scene where law enforcement found Marshall corroborated Marshall’s explanation for what he was doing there. Marshall told the officer who stopped him that he had pulled into the lot to fix a flat tire. Consistent with Marshall's statement, Marshall’s truck contained a damaged tire, and Marshall was sweating profusely- — even through the top of his shorts — as if he had just changed a truck tire on a hot June night in Florida, which, of course, it was. If Marshall was changing the tire before law enforcement arrived, it is difficult to conceive of when he would have had time to hide the money, the gun, the shirt, and the hat from the robbery— particularly since he likely would have had to have hidden them more than a block away from his truck, since even a K-9 unit never found any of these items in law enforcement’s thorough search of the one-block perimeter. In addition to lacking the time to successfully hide these items, had Marshall been the robber, it seems highly unlikely that he would have had the foresight to conceal them, considering that the robber did not even take the most minimal precaution of trying to disguise his appearance during the robbery. And if Marshall was not changing the tire, it is hard to imagine why Marshall would have been where he was found had he committed the robbery, since he could have driven 30 miles away by that time, since the truck was apparently otherwise operational.

.The Majority considers only Marshall's argument that his Terry-stop detention violated federal law, not that it violated state law. In the Majority’s view, Marshall never raised the . state-law argument prior to filing his brief before us, so he procedurally defaulted the issue. I respectfully disagree. During the evi-dentiary hearing on Marshall's Rule 3.850 motion in the state circuit court, Marshall asked his trial counsel, "Did you consider that at the time that the officer had completed his search and identification procedure that his continued detention of Mr. Marshall was illegal? That continued detention being putting him in handcuffs in the car, and taking him two miles to another site." (emphasis added). Then Marshall asked his trial counsel about the applicability of Fla. Stat. § 901.151(3), inquiring specifically by statutory number about his counsel's knowledge of that provision. Even the judge became involved in the discussion, and his comments indicate that he was reviewing the two-sentence statute during the questioning. Indeed, the judge stated he "want[edj to take.a look” at the statute. He then later described § 901.151(3) as "dealing] with the stop and frisk law” and noted that the provision had last been amended in 1997. If, in fact, Marshall had procedurally defaulted this meritorious issue, his collateral counsel would have also been ineffective. But that would not have been actionable under § 2254 since Florida allows on direct appeal ineffective-assistance claims like this one that may be established from the face of the trial record. See Martinez v. Ryan, - U.S. -, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. Section 901.151 provides,
(2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person's presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense.
(3) No person shall be temporarily detained under the provisions of subsection (2) longer than is reasonably necessary to effect the purposes of that subsection. Such temporary detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof.
(6) No evidence seized by a law enforcement officer in any search under this section shall be admissible against any person in any court of this state or political subdivision thereof unless the search which disclosed its existence was authorized by and conducted in compliance with the provisions of subsections (2)-(5).
(emphasis added).

. As the panel notes, we have similarly observed that the transportation of a defendant without probable cause exceeds the parameters of a lawful Terry stop: “We have frowned upon the movement of individuals for [purposes of investigation].” United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007) (citing United States v. Hardy, 855 F.2d 753, 760-61 (11th Cir. 1988); Hayes, 470 U.S. at 816, 105 S.Ct. at 1647).

. Passman v. Blackburn, 652 F.2d 559 (5th Cir. 1981), on which the Majority relies, bears not at all on the application of Fla. Stat. § 901.151. The defendant in Passman was arrested under Louisiana law, not Florida law, so our predecessor court did not consider the prohibitions of Fla. Stat. § 901.151.

. The state court’s application of Strickland’s performance prong, however, was contrary to federal law and did involve an unreasonable application of Strickland. It also was based on an unreasonable determination of the facts in light of the record before the state court. Specifically, the state court concluded that trial counsel had “consciously reviewed the issues and then made the tactical and strategic decisions not to pursue either the motion to suppress or the motion to exclude.” But during his testimony at the Rule 3.850 hearing, trial counsel offered only two reasons for not seeking suppression that could even arguably be deemed strategic: (1) he asserted that filing a written suppression motion "was a waste of time, and [he] could do it just as effectively at trial,” and (2) he thought no "judge in the state of Florida” would have granted the motion. Even assuming that objecting at trial in lieu of filing a written motion to avoid inconvenience qualifies as "strategy,” trial counsel did not, in fact, object at trial to admission of the fruits of the violation of Florida law. So it was plainly unreasonable for the state court to base its finding of strategy even in part on this explanation. In addition, the record betrays trial counsel’s ignorance of § 901.151(3) and 6. Long before the Florida court heard Marshall's Rule 3.850 motion, the Supreme Court established that a lawyer's decisions based on an unreasonable mistake of law violate Strickland’s performance prong. See Kimmelman, 477 U.S. at 385, 106 S.Ct. at 2588. Here, counsel failed to seek suppression because of his unreasonable mistake of law that Florida law did not provide a basis for a suppression motion in the circumstances of Marshall’s case. In fact, however, § 901.151(3) did; it provided a very solid basis for a suppression motion. Because the Florida court incorrectly characterized counsel’s failure to file a suppression motion as a matter of strategy instead of as an unreasonable mistake of law, it incorrectly and unreasonably applied Strickland's performance prong.