**Glenn S. PASSMAN,
Petitioner-Appellant,**

v.

**Frank BLACKBURN, Warden, Louisiana
State Penitentiary, et al.,
Respondents-Appellees.**

**No. 85–3249.**

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1986.
Rehearing Denied Sept. 23, 1986.

---

Glenn S. Passman pro se.

Henry Hoppe, III, Slidell, La. (Court-appointed), for petitioner-appellant.

Tom W. Thornhill, Asst. Dist. Atty., Abbott Reeves, Slidell, La., for respondents-appellees.

Before REAVLEY, RANDALL and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

Glenn S. Passman, an incarcerated state prisoner, appeals from the dismissal of his petition for a writ of habeas corpus, 28 U.S.C. §§ 2241, 2254. For the reasons that follow, we affirm the judgment of the district court.

I.

Passman was convicted by a jury in Louisiana in 1976 of armed robbery, and was sentenced to serve ninety-nine years without benefit of parole, probation, or suspension of sentence. The Louisiana Supreme Court affirmed the conviction. *State v. Passman,* 345 So.2d 874 (La.1977). After seeking post-conviction relief in state court,

Passman, proceeding *pro se,* filed in 1979 a petition for writ of habeas corpus under § 2254 in the federal district court raising the same claims as in the state petition. The petition raised eleven grounds. The district court's dismissal of the petition was affirmed by this court in 1981. *Passman v. Blackburn,* 652 F.2d 559 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982).

Passman, again proceeding *pro se,* filed the instant petition, his second in federal court, in 1984. He raised four claims that were not raised in the first federal petition: (1) improper prosecution comments at trial concerning Passman's post-arrest silence; (2) the sentence amounts to cruel and unusual punishment; (3) failure of the state to prove an essential element of the crime, namely, that Passman was armed with a dangerous weapon; and (4) failure of the state to prove that Passman had the specific intent to deprive permanently the victim of the property stolen. Passman explained in the petition his failure to include those four grounds in his first petition as follows:

> None of the claims presented in this petition were presented in the previous post-conviction application. The reasons are that defendant did not have the aid of counsel in presenting his claims; did not know that the claims were cognizable; did not have access to prison library; due to recent law.

The district judge ordered the petition referred to a magistrate, who filed an order pursuant to Rule 4, Rules Governing § 2254 Cases in the United States District Courts, requiring the state to file an answer complying with Rule 5. Before the state filed an answer (it had been given two extensions of time), the magistrate by *sua sponte* written order notified Passman that his petition was subject to dismissal under Rule 9(b), and requested that Passman explain why he "did not assert the grounds pleaded herein in his previous habeas corpus proceedings."[1]

---

1. Our precedents allow the district court to raise *sua sponte* the issue of abuse of the writ under

Rule 9(b). *Daniels v. Blackburn,* 763 F.2d 705, 707 (5th Cir.1985).

Passman responded on the 9(b) form as follows:

Firstly, the grounds set forth in the second petition are new and different grounds as alleged in the first petition. Secondly, defendant had no knowledge of the legal principles—law pertaining to the grounds set forth in the instant petition when he filed his first petition in 1977; did not have the assistance of counsel; did not have proper law library or legal aid assistance; and due to changes in the law.

In a memorandum of law accompanying the Rule 9(b) response, Passman asserted that "in 1977 when [he] filed his first petition there was not even a law library or legal aid assigned to Camp C, Angola, Louisiana. And subsequently when a legal aid was assigned to Camp C defendant was allowed to check three books out from the Main Prison Law Library and was not allowed to visit the law library." Further, as to his claim concerning improper prosecution comments on his post-arrest silence, which relies on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), Passman asserted that he:

absolutely did not understand the rationale of *Doyle* [ ] as it applied to the facts of his case. As a matter of fact defendant was not even aware of *Doyle* until after the first petition had been denied certiorari by the United States Supreme Court [in 1982]. Thereafter, while reading a "Georgetown Law Journal" defendant identified the *Doyle* violation was applicable to the facts of his case. Had defendant known of the rationale of *Doyle* in 1977 he definitely would have included it as one of his claims as the magnitude of the constitutional error would have definitely entitled him to relief then.

As to the sentencing issue, Passman claimed that he "was not aware that he had a liberty interest in the proper exercise of the sentencing judge's discretion which was a constitutional question of whether due process was accorded" until 1982.[2]

The state filed a short opposition to the petition a few days later. The state did not assert that Rule 9(b) barred consideration of the petition because the petition was an abuse of the writ. The state did not contend that Passman knew of the claims raised in the second petition at the time the first petition was filed. Rather, the state argued that "[i]t is apparent that the instant application is an effort to relitigate the issues considered by the entire State and Federal court system without change." The state further asserted that Passman was barred by "collateral estoppel" from pursuing the petition: "All bases for Federal habeas corpus have been examined by this and other Federal courts to no avail. All of those issues were previously considered and rejected and cannot now be reconsidered by this Honorable Court." Further, the state contended that Passman failed to exhaust state remedies.[3] Passman responded to the state's opposition that, in fact, "none of the issues presented [in the first petition] are raised in the instant petition."

Shortly thereafter, the district judge revoked the reference to the magistrate, and issued an order denying the petition. The district judge determined that the petition was barred under Rule 9(b), without holding an evidentiary hearing. The court did not adopt the state's argument advanced in the answer that the four claims in the second petition had actually been raised in the first petition. Rather, the district judge concluded that Passman should have raised the four new issues in the first petition; therefore, this petition was subject to dismissal as an abuse of the writ. The court did not address Passman's factual assertions that he had no actual knowledge of the *Doyle* or sentencing issues, no direct

---

**2.** The third and fourth claims in Passman's second petition relating to the sufficiency of the evidence are not mentioned in his brief on appeal; therefore, we consider those claims abandoned.

**3.** This claim, which appears patently frivolous, *see State ex. rel. Passman v. Maggio,* 457 So.2d 2 (La.1984), has not been briefed on appeal; therefore, we consider it waived.

access to a law library, and limited indirect access to books. The court did not find that Passman deliberately withheld these claims for delay or to harass the state. The district court concluded, however, that Passman did not "carry his burden of proof" of showing that the second petition was not an abuse of the writ:

> Passman's first habeas corpus application and the supporting memorandum he submitted to the state district court, the Louisiana Supreme Court, and the United States District Court exemplify well researched, comprehensive pleadings. The pleadings are not reflective of an individual who is unskilled or one who had insufficient knowledge of the law. Nor does the record reflect an individual incapable of utilizing tools of legal research to ascertain changes in the law.

> The court is therefore of the opinion that petitioner's claim for habeas relief should be dismissed on procedural grounds.... The grounds raised in this second application cannot be said to have been initially established by legislation or jurisprudence in the interim period between the filing of Passman's first petition and the filing of this one. These four grounds are not novel arguments recently recognized as giving rise to a claim for post-conviction relief.

The district court added, however, that even if it were to consider the merits, it was of the opinion that Passman would not be entitled to relief.

Passman filed a timely notice of appeal, and, still proceeding *pro se*, filed a detailed and well-reasoned brief with this court. Counsel was appointed to represent Passman after oral argument was scheduled. The state filed a brief, virtually devoid of any reasoned analysis, that has been of no assistance in considering the difficult issues raised on appeal. Oral argument was held, for which the state declined to appear.

## II.

### A.

■ Before we consider Passman's argument that his successive petition did not constitute an abuse of the writ, we begin by setting forth the factual record as the state has chosen to permit Passman to develop it. The state did not allege and the district court did not find that Passman actually knew about the claims in the second petition when the first petition was filed. The state did not challenge any of Passman's factual allegations concerning why the *Doyle* or *Helm* claims [463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637] were not raised in the first petition. Therefore, the district judge properly did not hold an evidentiary hearing on Passman's factual assertions; none was required where there were no contested issues of fact.[4] The issue we face is whether the state was entitled to judgment as a matter of law on this factual record.

The following must be taken as true for the purposes of this proceeding. Passman was subjectively unaware of the *Doyle* and *Helm* claims at the time he filed his first state and first federal petitions. He first learned of the possibility of a *Doyle* claim while reading a law review article in 1982 after his first federal petition had been

---

4. *See Jones v. Estelle,* 722 F.2d 159, 164 (5th Cir.1983) (en banc) (successive petition may be dismissed without hearing if petitioner could not justify successive petition "as a matter of law"), *cert. denied,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984). We have previously noted, in the context of Rule 9(a), that the standards of Fed.R.Civ.P. 56(c) concerning standards for summary judgment govern whether a Rule 9(a) dismissal may be effected summarily, without a hearing. *McDonnell v. Estelle,* 666 F.2d 246, 252 (5th Cir.1982); *see* Habeas Rule 11, Fed.R.Civ.P. 81(a)(2); *see also Soileau v. Blackburn,* 789 F.2d 1209, 1210 (5th Cir.1986). Consideration of whether dismissal under Rule 9(b) is appropriate, like that under Rule 9(a), is "necessarily fact oriented." *Urdy v. McCotter,* 773 F.2d 652, 656 (5th Cir.1985). Therefore, it seems sensible, as we did in *Jones v. Estelle,* 692 F.2d 380, 384–85 (5th Cir.1982), to apply the standards of Rule 56 to this Rule 9(b) issue. Accordingly, in order for a dismissal under Rule 9(b) to be appropriate without an evidentiary hearing, there must be no genuine issue of material fact, and the dismissal must be appropriate as a matter of law. *Id.; see Price v. Johnston,* 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948).

dismissed, and of the sentencing claim in 1982 while reading a Fifth Circuit opinion. The first and second federal petitions were prepared without the assistance of counsel. Passman did not have direct or indirect access to a law library for a lengthy period during which the first petition was prepared. The availability of books was limited. There is no evidence concerning Passman's education and whether he has any legal training. There is an utter absence of evidence that Passman filed this second petition for the purpose of delay or to vex or harass the state. Passman's first petition does evince above-average—for *pro se* petitioners—skill in legal research and writing. Further, Passman would not have immediately noticed the *Doyle* issue upon reading the trial transcript, because his counsel did not object to the prosecutor's questioning regarding Passman's post-arrest silence. *Cf. Hamilton v. McCotter*, 772 F.2d 171, 180 (5th Cir.1985) (error "appearing on the face of" trial record should have been raised).

### B.

We turn to the issue of whether, on this factual record, Passman has proved by a preponderance of the evidence that he did not abuse the writ. Rule 9(b) provides in pertinent part:

> A second or successive petition may be dismissed if the judge finds [1] that it fails to allege new or different grounds for relief and the prior determination was on the merits or, [2] if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

It seems clear, despite the state's assertion to the contrary in the district court, that the first clause of Rule 9(b) is entirely inapplicable to this petition. The plain fact is that the *Doyle* and sentencing claims were not included in the first petition. Therefore, we turn to the second clause of Rule 9(b), and whether Passman's actions constitute an "abuse of the writ."

■ The salutary purpose of the abuse of the writ doctrine of Rule 9(b) "is to avoid piecemeal litigation, with petitioners advancing one claim at a time." *Rudolph v. Blackburn*, 750 F.2d 302, 305 (5th Cir. 1984). However, "[w]hile the doctrine of successive petitions certainly has a place to prevent abuse of the remedy, it ought not to be used as a subterfuge or obstacle to prevent a petitioner from getting the merits of his contentions before the court." R. Sokol, *Federal Habeas Corpus* at 192–93 (1969); *see generally* Williamson, *Federal Habeas Corpus: Limitations on Successive Applications From the Same Prisoner*, 15 Wm. & Mary L.Rev. 265 (1973).

Rule 9(b) does not define the phrase "abuse of the writ." However, the legislative history of Rule 9(b) indicates that Congress intended to codify the principles governing abuse of the writ set forth in the leading case of *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963):

> As the Supreme Court has noted in reference to successive applications for habeas corpus relief and successive § 2255 motions based upon a new ground or a ground not previously decided on the merits, "full consideration of the merits of the new application can be avoided only if there has been an abuse of the writ or motion remedy; and this the Government has the burden of pleading." *Sanders v. United States*, 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). See also 28 United States Code, section 2244(b).

H.R.Rep. No. 1471, 94th Cong. 2d Sess. 5–6, *reprinted in* 1976 U.S. Code Cong. & Ad. News 2478, 2482. *See* Clinton, *Rule 9 of the Federal Habeas Corpus Rules*, 63 Iowa L.Rev. 15, 30–31, 38 (1977). Thus, we must examine *Sanders* to determine what constitutes an abuse of the writ. *See Rose v. Lundy*, 455 U.S. 509, 521, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982) (plurality opinion of O'Connor, J.) (Rule 9(b) "incorporates the judge-made principle governing the abuse of the writ set forth in *Sanders*"); *id.* 455 U.S. at 534–35, 102 S.Ct. at 1211–12 (Brennan, J., concurring in part

and dissenting in part) (interpretation of Rule 9(b) "necessarily entails an accurate interpretation of the *Sanders* standard"). *See also Jones v. Estelle,* 722 F.2d 159, 163 (5th Cir.1983) (en banc) ("Rule 9(b) largely codified the principles enunciated in *Sanders*"), *cert. denied,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984); L. Yackle, *Postconviction Remedies* § 154, at 563 (1981).[5]

The Court in *Sanders* discussed the abuse of the writ doctrine as follows:

> if a prisoner *deliberately withholds* one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground.... Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.

373 U.S. at 18, 83 S.Ct. at 1078 (quoted in *Jones,* 722 F.2d at 163). As we stated in *Jones,* "*Sanders* relied on *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), to indicate the limits of the writ abuse doctrine." 722 F.2d at 163. *Noia* held that "a petitioner

loses the right to have a claim considered on a successive petition if he 'understandingly and knowingly forewent the privilege' of raising that claim in his initial petition. The bar 'depends on the considered choice of the petitioner.'" *Id.* (quoting *Noia,* 372 U.S. at 439, 83 S.Ct. at 849).[6]

A petitioner, even one proceeding *pro se,* who has actual knowledge of facts or legal theories that might be raised in a petition when the first petition is filed will in general be barred from raising those claims in a successive petition. *Jones,* 722 F.2d at 163; *Autry v. Estelle,* 719 F.2d 1247, 1250 (5th Cir.1983) (*pro se* petitioner "aware" of claim but chose to withhold it). The district court did not find that Passman had actual knowledge of the *Doyle* or *Helm* claims in 1979. It essentially concluded that Passman had constructive knowledge of the claims at that time—as a "skilled writ-writer" he should have known about them—thus the claims' consideration was barred in the second petition. Therefore, this case presents the question reserved in *Jones,* 722 F.2d at 163 n. 3, of "whether the knowledge of a pro se petitioner is judged by an actual knowledge standard or by a constructive knowledge— such as a reasonable man—standard."[7] *Id.; see also Daniels v. Blackburn,* 763 F.2d 705, 707 (5th Cir.1985).[8]

---

**5.** We noted in *Jones* that perhaps not all the principles set forth in *Sanders* were codified in Rule 9(b). 722 F.2d at 167 n. 7. For example, although *Sanders* could arguably be read to require personal waiver of federal rights by a petitioner, *Sanders* was not so read by the Supreme Court at the time Rule 9(b) was codified. *See id.* (citing *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965)). The discrete issue before us, however, is the state of a *pro se* petitioner's knowledge of claims for purposes of application of the abuse of the writ doctrine. The principles of *Sanders* that govern that issue do not appear to have been altered by the Supreme Court in the intervening years before Rule 9(b) was codified.

**6.** *See also* 28 U.S.C. § 2244(b); *Wong Doo v. United States,* 265 U.S. 239, 241, 44 S.Ct. 524, 525, 68 L.Ed. 999 (1924).

**7.** In *Jones,* we decided that a prisoner's actual knowledge of claims that he failed to assert in

one petition was irrelevant when the petitioner was represented by competent counsel in preparing that petition. 722 F.2d at 169. In such cases, a petitioner "is chargeable with that awareness that a competent lawyer would have possessed." *Id.*

**8.** The state contends in passing that the lapse of time between the conviction and this appeal should bar consideration of the petition, citing to the Chief Justice's written statement regarding a denial of certiorari in *Spalding v. Aiken,* 460 U.S. 1093, 103 S.Ct. 1795, 76 L.Ed.2d 361 (1983). Suffice it to say that delay is a matter to be considered under Rule 9(a), not Rule 9(b), and then only on the question of whether the state "has been prejudiced in its ability to respond to the petition by delay in its filing." *Vasquez v. Hillery,* —— U.S. ——, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986). It is no defense to a habeas corpus petition that the state may be unable to retry the petitioner. *Id.* In any event,

In light of *Sanders,* there is no room in habeas corpus adjudications for an analysis that allows application of the abuse of the writ doctrine to a *pro se* petitioner who did not subjectively know about a particular legal claim set forth in a successive petition when an earlier petition was filed. A *pro se* petitioner must, at the least, knowingly withhold a claim in order for the abuse of the writ doctrine to apply. *Sanders,* 373 U.S. at 18, 83 S.Ct. at 1078; *Noia,* 372 U.S. at 438–39, 83 S.Ct. at 848 49. The withholding must be a matter of the "considered choice of the petitioner." *Noia,* 372 U.S. at 439, 83 S.Ct. at 849; *see Jones,* 722 F.2d at 163, 166 n. 7 (*Noia* "defined waiver in terms of an understanding and knowing decision by an individual to forego a claim"). As the Fourth

Circuit stated in *Miller v. Bordenkircher,* 764 F.2d 245 (4th Cir.1985), to apply the abuse of the writ doctrine there must be " 'more than simply a failure to present a ground existing at the time of the previous petition.' " *Id.* at 251 (quoting *Johnson v. Copinger,* 420 F.2d 395, 399 (4th Cir. 1969)).[9] "As a minimum, the newly asserted ground must have been known to the petitioner at the time of the earlier petition." *Johnson,* 420 F.2d at 399.

In short, the controlling cases give no succor to the argument that a *pro se* petitioner abuses the writ when he does not knowingly withhold a particular claim because he does not actually understand that the claim may be made, even though a "reasonable" *pro se* petitioner might have known of the claim.[10] As the Court stated

---

the state does not claim that it will be unable to retry Passman, and it has not asserted that it was unable to respond to the allegations of the petition. At no time has the state suggested that Rule 9(a) is applicable to this case. As the state has chosen to frame the issues in this matter, the delay between the conviction and this petition is irrelevant.

**9.** In *Hamilton v. McCotter,* 772 F.2d 171 (5th Cir.1985), a case concerning waiver by a petitioner represented by counsel, the court stated that "[w]e have said that the appropriate standard against which to determine abuse of the writ is not whether a successive petitioner intended to bypass an issue at the time of the previous petition, but 'whether he withheld it without legal excuse when he filed his earlier petition.' " *Id.* at 176 (quoting *Jones,* 722 F.2d at 163). In the case *sub judice,* the issue is whether the lack of subjective knowledge of a claim constitutes legal excuse.

**10.** *See Booker v. Wainright,* 764 F.2d 1371, 1376 (11th Cir.1985) ("petitioner may avoid dismissal if he proves by a preponderance of the evidence that he was ignorant of the facts necessary to support the new ground when he filed his prior habeas petition"), *cert. denied,* —— U.S. ——, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); *Burnside v. White,* 760 F.2d 217, 219–20 (8th Cir.) (Rule 9(b) dismissal inappropriate absent allegation that petitioner "deliberately failed" to raise new claim in earlier petition), *cert. denied,* —— U.S. ——, 106 S.Ct. 576, 88 L.Ed.2d 559 (1986); L. Yackle, *supra,* at § 155; *cf. Hamilton,* 772 F.2d at 179 ("*pro se* petitioner's ignorance of the legal significance of facts known to him at the time of the earlier petition might provide an excuse for failure to raise those issues in the prior

proceeding"); *Jones,* 722 F.2d at 165; *Vaughan v. Estelle,* 671 F.2d 152, 153 & n. 5 (5th Cir. 1982).

A leading commentator has stated that the Supreme Court has "come ever so close" to changing the law in this area, replacing *Sanders* with the standard for default set forth in *Wainright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), which addresses the effect of a petitioner's procedural default in state court. L. Yackle, *supra,* § 155, at 563 n. 33 (Supp.1986). Indeed, in recent capital cases, a majority of the Court has not expressly applied *Sanders* when ruling on successive petitions, although those decisions do seem to be consistent with the principles set forth in *Sanders.* In *Woodard v. Hutchins,* 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984) (per curiam), the Court vacated a stay of execution. Justice Powell, joined by four other justices, stated in a concurring opinion that the new claims were "a clear example of the abuse of the writ … [because] [a]ll three of [petitioner's] claims could and should have been raised in his first petition for habeas corpus." *Id.* 464 U.S. at 379, 104 S.Ct. at 753. Justice Powell stated that there was "no explanation as to why they were not all raised in one petition." *Id.* Although that fact alone differentiates *Hutchins* from the case *sub judice,* it is clear that a substantial ground for Justice Powell's opinion was the fact that Hutchins was on death row:

A pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent.

*Id.* 464 U.S. at 380, 104 S.Ct. at 753. Accordingly, it seems clear that the concurrence in *Hutch-*

in *Price v. Johnston,* 334 U.S. 266, 291–92, 68 S.Ct. 1049, 1062–63, 92 L.Ed. 1356 (1948), an abuse of the writ case in which the Court reversed dismissal of the petitioner's fourth federal petition, "we cannot impose on [*pro se* petitioners] the same high standards of the legal art which we might place on members of the legal profession," and which we placed on counsel in *Jones.* Pursuant to *Sanders* and *Noia,* we hold that the knowledge of facts and legal claims by a *pro se* petitioner is judged by an actual knowledge standard for purposes of application of the abuse of the writ doctrine.[11] On this record Passman has introduced ample evidence that he did not know about the *Doyle* and sentencing claims when he filed his first federal petition, the state has offered no evidence whatever to the contrary, and the evidence that Passman is a "skillful writ-writer" standing alone is insufficient evidence from which to infer that he knew about the claims in 1979. He has proved by a preponderance of the evidence [12] that he did not abuse the writ; therefore, the district court abused its discretion in applying Rule

9(b). We turn to the merits of the *Doyle* and sentencing claims.

### III.

### A.

Passman testified on his own behalf at the trial. He denied any involvement in the robbery, and offered as an exculpatory story, backed by other witnesses including his wife, that he was in Mississippi visiting relatives named Burris on the date of the crime, and had returned to his house in Louisiana at 8:00 p.m., about 1½ hours before the robbery. He stated that his mother-in-law, a Mrs. Matthews, drove him to his home in Louisiana from Mississippi, and left to return to Mississippi at 8:30 p.m. Passman testified that after his mother-in-law left to return to Mississippi, he did not leave the house. The robbery began at about 9:30 p.m., in a town twenty-five miles from Passman's home. *See Passman,* 652 F.2d at 563–64. Passman was arrested at his home at 10:15 p.m., twenty-three min-

---

*ins* is consistent with *Sanders,* which held that a successive petition may be dismissed if it is filed for the purpose of delay. A capital sentence may not be carried out, of course, if a judge grants a stay of execution while considering a habeas corpus petition, whether it be a prisoner's first or his fiftieth petition. Therefore, a successive petition clearly could be filed simply to delay implementation of the state's sentence in a capital case. Delay alone in a non-capital case, on the other hand, is less problematic, so far as the state is concerned. The state's sentence has been executed and the prisoner is incarcerated at the time each habeas petition is filed, although even in a non-capital case the state has an interest in avoiding repeated defenses of the same conviction.

In *Antone v. Dugger,* 465 U.S. 200, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984), the Court denied a stay of execution to a petitioner with a successive petition. The claims raised in the second federal petition had been raised in the prisoner's first state petition. Therefore, the petitioner "hardly can contend that these claims were unknown to him" when he filed his first federal petition. *Id.* 465 U.S. at 206, 104 S.Ct. at 965. Further, the Court stated that the claims raised were "meritless." *Id.* at 207, 104 S.Ct. at 965. *Antone* simply stands for the proposition, settled in this circuit, that a petitioner may be barred from presenting a second petition when he or,

inferentially, his counsel actually knew of the claims raised in the second petition at the time the first petition was filed.

Therefore, it appears none of the recent Supreme Court jurisprudence in this area has effected a change in the principles of *Sanders* concerning the abuse of the writ doctrine, even assuming that such a change could be effected in light of Congress' codification of *Sanders* into Rule 9(b), *see* L. Yackle, *supra,* § 155, at 564 ("congressional endorsement of the Sanders approach in Rule 9(b) would surely make any significant departure from present law difficult").

**11.** The instant case does not implicate or alter the rule of *Jones v. Estelle,* 692 F.2d 380 (5th Cir.1982), in which we held that a petitioner's subjective awareness of the abuse of the writ doctrine and the need to raise all known claims in one petition is irrelevant to application of the doctrine. Rather, the only issue before us is regarding the abuse of the writ doctrine is the standard for determining a petitioner's knowledge of legal claims.

**12.** *See Daniels,* 763 F.2d at 707. *Compare Hamilton,* 772 F.2d at 175 ("conclusory claim" insufficient to show ignorance of legal issue); *Booker,* 764 F.2d at 1377 ("bald allegation" of ignorance insufficient to meet burden).

utes after police were notified of the robbery by its victims. *Id.* at 564.[13]

The prosecutor did not cross-examine Passman. The defense rested after Passman's direct testimony, and the state immediately thereafter called as a rebuttal witness Wallace Laird, chief deputy of the sheriff's department and the supervisor of the investigation of the robbery. The state examined Chief Laird as follows:

Q Chief Laird, did Glenn Passman ever tell you where he was that day?

A Did Glenn Passman ever tell me?

Q Yes, sir.

A No, sir, he did not.

Q Did he ever mention the names Mr. and Mrs. Burris to you?

A Not to me.

Q Did he ever mention the name of Mrs. Matthews, who is his mother-in-law to you?

A No, sir.

Q Did he ever tell you, to your knowledge, that he was with those people that weekend?

A No, sir.

\* \* \* \* \* \*

Q During the almost two years since this happened, Chief Laird, has anybody, either Glenn Passman, his wife, Mrs. Matthews, Mr. or Mrs. Burris or anybody ever told you that Mrs. Matthews was with Glenn Passman and them until 8:30 that night?

A No, sir, not to my knowledge.[14]

Trial Tr. vol. 5, at 602–03. Further, during closing argument the prosecutor made the following comment:

Let's get on Glenn Passman's witnesses, which if you noticed, he made no comments about those two upstanding people from Mississippi who testified....

*Id.* at 683. Passman contends that Chief Laird's testimony and the prosecutor's closing argument violated his due process rights.

**B.**

In *Doyle v. Ohio,* 426 U.S. 610, 617–18, 96 S.Ct. 2240, 2244–45, 49 L.Ed.2d 91 (1976), the Court held that cross-examination of a defendant concerning his post-arrest silence, offered to impeach the defendant on the theory that silence is inconsistent with an exculpatory story told at trial, deprived the defendant of the fundamental fairness guaranteed by the due process clause. *See also Wainright v. Greenfield,* —— U.S. ——, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986); *United States v. Shavers,* 615 F.2d 266, 269 (5th Cir.1980) (post-arrest silence may not be used as evidence of guilt or for impeachment purposes); *United States v. Mireles,* 570 F.2d 1287, 1292 (5th Cir.1978). The *Doyle* rule "is bottomed on the insoluble ambiguity of post-arrest silence that necessarily results when a defendant has been read his *Miranda* rights; the defendant's silence may well indicate, not that he has no exculpatory story to tell, but that he is simply exercising the rights to which he has been advised." *United States v. Blankenship,* 746 F.2d 233, 237 (5th Cir.1984); *see Stokes v. Procunier,* 744 F.2d 475, 479 (5th Cir. 1984). On the other hand, a testifying defendant may be impeached with evidence of pre-arrest, pre-*Miranda* warning silence,

---

**13.** The reason why the investigation focused immediately on Passman is not clear from the trial record. Two men took part in the robbery. One of the victims identified one of the attackers from a photo array immediately after the robbery as Walter Burnette. The victims were not shown a picture of Passman, and they described the second attacker simply as "tall, dark-complexioned." Police in Covington, Louisiana, the site of the robbery, immediately radioed police in Hammond, where Passman lived, to "stake his house out." That decision was made after receipt of "particular police information" and "other information," Trial Tr. at 515, 517,

which was not specified at trial. In closing argument, however, the prosecutor stated that police went to Passman's house solely because of the description the victims gave police. *Id.* at 686. There seems to be no evidentiary basis for the latter statement.

**14.** Chief Laird did testify, however, that Passman's wife told him that the couple had been fishing in Mississippi earlier in the weekend when police arrested Passman. Passman's wife had so testified during the defense's case in chief.

because "no governmental action [has] induced [the defendant] to remain silent." *Jenkins v. Anderson*, 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 L.Ed.2d 86 (1980). *Doyle* is applicable to this case, because Passman's case was pending in the trial court (he had not yet been sentenced) at the time *Doyle* was decided. *Price v. King*, 714 F.2d 585, 588 (5th Cir.1983).

As a threshold matter, we review the state's contention that *Doyle* is inapplicable because Chief Laird's testimony may have concerned Passman's pre-arrest silence. *See Jenkins*, 447 U.S. at 240, 100 S.Ct. at 2130. The state asserts that Passman's first contact with the police, at 10:15 p.m. on the day of the robbery, when he was handcuffed, given *Miranda* warnings, and placed in a police car to go to the police station, did not amount to an arrest. Therefore, the state argues, Chief Laird's testimony may have concerned Passman's silence at that point in time, before Passman was arrested. However, the actions of the police at 10:15 p.m. unquestionably amounted to an arrest, *Passman*, 652 F.2d at 564, and, in any event, Passman's silence was admittedly post-*Miranda* warnings. Neither Chief Laird nor any other officer had any contact with Passman in the time period between Passman's return from Mississippi at 8:00 p.m. until Passman's arrest, a fact which was made clear to the jury during the state's case-in-chief when Chief Laird and other officers testified as to the circumstances under which they first encountered Passman. There simply were no pre-arrest confrontations with Passman. Therefore, we reject the state's contention that Chief Laird's testimony was not a reference to post-arrest silence.[15]

As to the merits of the *Doyle* claim, there are two "alternative tests for determining whether a prosecutor's or wit-ness' remarks constitute comment on a defendant's silence." *United States v. Shaw*, 701 F.2d 367, 381 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). These are (1) "whether the 'manifest intent' was to comment on the defendant's silence," or (2) "whether the character of the remark was such that the jury would 'naturally and necessarily' construe it as a comment on the defendant's silence." *Id.* "Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur." *Id.*

In the case *sub judice*, it seems clear that not only did the prosecutor intend to comment on Passman's silence, but a jury would naturally and necessarily construe that to be the case. "The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation." *Shaw*, 701 F.2d at 382. To be sure, the jury could conceivably have believed that Passman returned from Mississippi at 8:00 p.m. and nevertheless committed the robbery. However, the story, if believed, would have made it somewhat less likely that Passman committed the robbery, because he would have had little time to meet his confederate and travel to the site of the robbery. Further, and more important, Passman testified that he did not commit the crime. Passman's credibility thus was an issue in the trial. The conclusion is inescapable that Chief Laird's testimony and the prosecutor's argument were designed and would be understood to be a comment on Passman's failure to provide the story offered at trial after his arrest, and to be a general attack on Passman's credibility. Our conclusion on this point is further compelled by the timing of Chief Laird's testimony, immediately fol-

---

15. The state's only argument as to the applicability of *Doyle* is that the testimony may have concerned pre-arrest silence. The state does not argue that Chief Laird's testimony, even if it concerned Passman's post-arrest silence, did not violate *Doyle* because the evidence referred to silence not in the *immediate* post-arrest time frame. The Court in *Doyle* did not address this issue. 426 U.S. at 616 n. 6, 96 S.Ct. at 2244 n. 6; *see United States v. Mireles*, 570 F.2d 1287, 1292 & n. 8 (5th Cir.1978) ("comments on silence at times subsequent to the immediate post-arrest period present[ ] 'different considerations from those implicated by cross-examining petitioners or defendants as to their silence after receiving *Miranda* warnings at the time of arrest'").

lowing Passman's direct examination. In short, the prosecutor carefully contrived to introduce evidence of Passman's silence, which could have gone to the implausibility of Passman's arguably exculpatory story as well as to his credibility, only a matter of minutes after Passman had offered the story and denied committing the crime. This plainly offends the principles enunciated in *Doyle*.

### C.

 Our inquiry does not end here, however. A *Doyle* violation may constitute harmless error. *Shaw*, 701 F.2d at 382. The general harmless error test is set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which requires "the beneficiary of the constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" in order for error to be harmless. *Id.* 386 U.S. at 24, 87 S.Ct. at 828. As stated in *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963), the issue is not "whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of." Rather, the "question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* *See United States ex rel. Miller v. Greer*, 789 F.2d 438, 443 (7th Cir.1986) (en banc) ("harmless beyond a reasonable doubt" is appropriate standard to apply in collateral proceedings challenging *Doyle* violation); *see also Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir.1983) ("because the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception"), *cert. denied*, 468 U.S. 1219, 104 S.Ct. 3589, 82 L.Ed.2d 886 (1984); *United States v. Edwards*, 576 F.2d 1152, 1155 (5th Cir.1978) (circumstances under which comment upon silence of defendant will not result in reversal "are few and discrete"). *See generally Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

In *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), we described three general types of *Doyle* violations in an attempt to weigh the effects of a *Doyle* error:

 When the prosecution uses defendant's post arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.

 When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.

 When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

*Id.* at 1249. We have recognized, however, that not all cases fit neatly into these categories. *See, e.g., Alderman v. Austin*, 695 F.2d 124, 126 n. 7 (5th Cir. Unit B 1983) (en banc) (*Chapman* categories not to be used as "rigid rules"); *United States v. Shavers*, 615 F.2d at 270; *cf. United States v. Ylda*, 643 F.2d 348, 350 (5th Cir.1981) (*Chapman* not applied where prosecution did not actually evoke testimony regarding defendant's silence, but only asked improper question).

 This case does not seem to fall squarely into any of the categories of cases discussed in *Chapman v. United States*. The prosecutor, through a direct examina-

tion of Chief Laird, directly linked Passman's post-arrest failure to provide the story about the trip to Mississippi to the police with the plausibility of that story at trial. But the plausibility of that story, the story challenged, was hardly of central relevance to the defense. It provided only marginal evidence that Passman could not practicably have been involved in the robbery. It was not truly an exculpatory story, because Passman could have returned from Mississippi at 8:00 p.m., waited until his mother-in-law left at 8:30, and still have committed the robbery at 9:30. Rather, the heart of the defense was Passman's subsequent testimony that he did not take part in the robbery and that he was at home with his wife when the robbery occurred. It is only when *Doyle* errors go to the heart of the defense that the first category of *Chapman* is implicated. The prosecutor simply did not ask Chief Laird whether Passman had denied taking part in the robbery after arrest; therefore, the first *Chapman* category does not apply. *Compare United States v. Harp*, 536 F.2d 601, 603 (5th Cir.1976); *United States v. Smith*, 635 F.2d 411, 413 (5th Cir.1981); *United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir.1977).[16]

However, Passman's general credibility was undoubtedly called into question by Chief Laird's testimony, even though Chief Laird's testimony did not directly attack Passman's exculpatory story. If the jury believed that Passman fabricated his story about going to Mississippi, it could have inferred that Passman's statement concerning his involvement in the robbery likewise was fabricated. Therefore, the issue before us is whether there is a reasonable possibility that the prosecutor's attack on Passman's general credibility through evidence admitted in violation of *Doyle* might have contributed to the guilty verdict.

We are guided by language in the Supreme Court's recent opinions in *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). In *Clark*, the Court held that a harmless error analysis could be applied in a case involving a jury instruction unconstitutional under the principles set forth in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The Court stated that "while there are some errors to which *Chapman [v. California]* [, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705] does not apply, they are the exception and not the rule." 106 S.Ct. at 3106. The Court continued:

> [I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."

*Id.* at 3106–07.

The Court in *Clark* relied in part on its earlier decision in *Hasting*, which considered a violation of the fifth amendment when a prosecutor referred in closing argument to the failure of the defense to introduce evidence on a particular point, a violation quite similar to that in the case *sub judice*. The Court of Appeals reversed the conviction without examining the evidence

---

16. *See also United States v. Meneses-Davila*, 580 F.2d 888, 895 (5th Cir.1978); *United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir.1977) (evidence admitted in violation of *Doyle* "went to the heart of the sole defense, encouraging the jury to believe that the defense was fabricated after arrest"); *United States v. Luna*, 539 F.2d 417, 417 (5th Cir.1976). *Cf. Williams v. Zahrad-*

nick, 632 F.2d 353, 361 & n. 10 (4th Cir.1980) ("When refutation of an exculpatory defense is the purpose [of prosecution conduct that violates *Doyle*], attack is on the jugular of the defendant's case, his innocence, and it is rarely declared harmless.") (citing *Harp*, 536 F.2d at 602–03).

of the defendants' guilt. The Supreme Court reversed:

Since *Chapman [v. California]* [, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705] the Court has consistently made clear that it is the duty of a reviewing court *to consider the trial record as a whole* and to ignore errors that are harmless, including most constitutional errors.

*Id.* 461 U.S. at 509, 103 S.Ct. at 1980 (emphasis added). The Court summarized the nature of a reviewing court's function:

The question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?

*Id.* at 510–11, 103 S.Ct. at 1981–82. The Court proceeded to examine the "whole record." [17]

■ There can be no doubt that Passman's credibility was an important part of this case, as it is in any case in which the defendant testifies under oath that he did not commit the crime, contradicting prosecution witnesses. If the jury believed Passman rather than the three victims who identified him, then the guilty verdict would not have been returned. But, as noted above, this is not a case in which the prosecution directly challenged through evidence that violates *Doyle* a truly exculpatory story offered by a defendant for the first time at trial. *Compare Harp,* 536 F.2d at 603; *Price,* 714 F.2d at 588. Here, unlike *Price,* the prosecutor did not *"directly* link" the implausibility of Passman's exculpatory story—that he was at home while the robbery was committed—to his ostensibly inconsistent post-arrest silence. *Id.* (emphasis added). Rather, that exculpatory story was only indirectly attacked

by Chief Laird's testimony, a fact which makes it less likely that the jury would have concentrated on the testimony or found it of substantial importance. Further, and very importantly, this is not a case which essentially comes down "to a one-on-one situation, *i.e.,* the word of the defendant against the word of the key prosecution witness, and there is no corroboration on either side," as in *Velarde v. Shulsen,* 757 F.2d 1093, 1095 (10th Cir. 1985). In that situation, "the importance of the defendant's credibility becomes so significant that prosecutorial error attacking that credibility cannot be considered harmless beyond a reasonable doubt." *Id.*[18] Here, however, there was a greater opportunity for assessment of the witness' credibility. The *three* victims—not just one—testified unequivocally that Passman was the individual who robbed them in their home. Their testimony was not shaken despite vigorous and spirited cross-examination by Passman's counsel. The victims had a lengthy period of time to observe the robbers, perhaps up to twenty minutes in a fully lighted house. Further, Passman's testimony concerning the events of the evening in question was, in large part, corroborated by the testimony of his wife, and, to a lesser extent, his mother-in-law. The jury was required to reject the credibility of Passman's wife as well as of Passman to return a guilty verdict, and her credibility was unaffected by Chief Laird's testimony.

Further, and significantly, the testimony of Passman's wife was inconsistent with Passman's story in one crucial aspect. Passman testified that upon returning to Louisiana from Mississippi, he, his wife, and his mother-in-law stopped at several convenience stores in order to find a newspaper. Passman testified that he was unemployed, and wanted a newspaper to look

17. In a recent case interpreting *Doyle,* the Court declined to evaluate the harmlessness of *Doyle* error because the state failed to raise the issue. *Wainright v. Greenfield,* — U.S. —, 106 S.Ct. 634, 640 n. 13, 88 L.Ed.2d 623 (1986).

18. In *Miller,* 789 F.2d at 446, the Seventh Circuit sitting *en banc* refused to find *Doyle* error harm-

less when the "crux" of the trial was whether the jury believed prosecution witnesses or the defendant. *See United States v. Johnson,* 495 F.2d 242, 246 n. 5 (10th Cir.1974) (where the essence of a case is jury determination of defendant's credibility, admission of tainted evidence regarding that credibility cannot be harmless).

for a job in New Orleans; he assertedly intended to go to New Orleans to apply for jobs on the day after the robbery. Passman testified that they "never did find" a paper, Trial Tr. at 599. Passman's wife, on the other hand, testified that when Passman was arrested, he was lying in bed reading a newspaper. Trial Tr. at 587. Although Passman's wife did not state that the newspaper that Passman was reading had been bought earlier that day, which would have directly conflicted with Passman's testimony, such an inference would have been entirely reasonable in light of Passman's asserted absence from his house for several days.

Finally, the victims told police that one robber was wearing a bandanna around his head at the time of the robbery. The arresting officer testified that when he effected the arrest, Passman had a mark on his forehead and his hair was pressed down, as if he had recently worn a bandanna.

■ The question is close, largely because of the timing of the improper testimony. But the testimony was not dwelled on in closing arguments, nor did the trial court instruct the jury that silence could be used as impeachment. Even taking into account the inherent problems of eyewitness identification, *see Manson v. Brathwaite*, 432 U.S. 98, 112, 97 S.Ct. 2243, 2251, 53 L.Ed.2d 140 (1977), the three victims testified forcefully as to the certainty of the identification. Under the circumstances of this trial, Passman's credibility was in all probability damaged more severely by the apparent inconsistency of his and his wife's stories on a point of crucial significance, than by the prosecutor's indirect challenge to that credibility by a questioning of the veracity of Passman's testimony concerning the essentially irrelevant trip to Mississippi. That questioning, although ill-advised, added little to the prosecution's case. After an examination of the entire trial record, we conclude that if the improper testimony had not been admitted, it is clear beyond reasonable doubt that the jury would have returned a verdict of guilty.

## IV.

Finally, we turn to Passman's claim that his sentence violates the eighth amendment. As he notes, *"Solem v. Helm*, [463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)], is relied upon almost entirely for the relief sought . . ." Under *Helm:*

> [A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Id.* 463 U.S. at 292, 103 S.Ct. at 3010. However, "[i]n view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." *Id.* at 290 n. 16, 103 S.Ct. at 3009 n. 16. *See United States v. Lamp*, 779 F.2d 1088, 1098 (5th Cir.1986).

■ Passman's sentence was harsh, particularly for a first-time felony offender. The unavailability of parole within a reasonable time also seems to favor Passman's argument that his sentence is unconstitutionally severe. *Cf. Moreno v. Estelle*, 717 F.2d 171, 180 (5th Cir.1983). But as to the gravity of the offense, the crime of armed robbery is in general a very serious felony. Further, examining the specific circumstances of this offense, *cf. Enmund v. Florida*, 458 U.S. 782, 797–801, 102 S.Ct. 3368, 3376–79, 73 L.Ed.2d 1140 (1982), we can state unequivocally that they militate in favor of a severe sentence; this armed robbery was particularly serious. The victims were robbed in their home. One victim, a 78–year-old man, was shot and seri-

ously wounded. Another victim, a 16–year-old girl, testified that Passman sexually abused her. The victims had guns placed to their heads and were repeatedly threatened with death.

Second, we should compare the sentence Passman received with those received by other criminals in Louisiana. "If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Helm,* 463 U.S. at 291, 103 S.Ct. at 3010. Among the crimes punishable by imprisonment for up to 99 years, without parole, or for life without parole, in Louisiana are: first degree murder, La. Rev.Stat.Ann. § 14:30(C); aggravated rape, *id.* § 14:42(C); aggravated kidnapping, *id.* § 14:44; and armed robbery, *id.* § 14:64(B). We cannot conclude that the crimes of aggravated rape and aggravated kidnapping are more serious from a societal viewpoint than armed robbery. Rather, these crimes are all extremely serious, and they carry essentially identical serious penalties. Taking into account the "absolute magnitude" of the crime of armed robbery, *Helm,* 463 U.S. at 293, 103 S.Ct. at 3011, a 99–year sentence without possibility of parole is not necessarily constitutionally inappropriate.[19]

Finally, Passman makes no argument that the punishment assessed in his case is disproportionate to the punishment given armed robbers in other jurisdictions.

Under these circumstances, we conclude that Passman's sentence is proportionate to the crime for which he was convicted, and does not violate the eighth amendment, under the principles set forth in *Solem v. Helm.*

### V.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

**19.** Passman has offered extensive evidence concerning the sentences given other convicted armed robbers in Louisiana. That evidence is simply not relevant to an application of the second prong of *Helm. Cf. id.* 463 U.S. at 293, 103 S.Ct. at 3011.