Ronald LITTLE, Petitioner–Appellant,

v.

Robert H. BUTLER, Sr., Warden, Louisiana State Penitentiary, Respondent–Appellee.

No. 87–3070.

United States Court of Appeals, Fifth Circuit.

June 28, 1988.

---

Henry D. Gabriel, New Orleans, La., (Court-appointed), for petitioner-appellant.

Ronald Little, pro se.

William A. Marshall, Asst. Dist. Atty., New Orleans, La., for respondent-appellee.

Before VAN GRAAFEILAND,[*] JOHNSON and JOLLY, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Ronald Little appeals from a judgment of the United States District Court for the Eastern District of Louisiana (Livaudais, J.) which denied Little's petition for habeas corpus relief from a Louisiana Criminal Court judgment convicting him of attempted armed robbery. For the reasons that follow, we affirm.

In the early afternoon of December 12, 1978, Larry Hall, a forty-one-year-old Marine Corps veteran, was sitting in his parked automobile on Broad Street in New Orleans, waiting for his mother to come out of a restaurant. As he sat there reading a magazine, he overheard four young males talking only a short distance from the car. Appellant Little, the apparent leader of the quartet, was either twenty or twenty-one years of age; at least two of the others were juveniles, five or six years younger than Little.

Hall heard Little say, "Let's go rob the restaurant," and watched as Little sent two of the youths into the restaurant. When they returned with the report that they had been watching the restaurant all day and "[t]hey don't have any money in there", Little said, "Let's rob the paint store." The four then proceeded across the street to the paint store.

Little gave sixteen-year-old Michael Rogers a .22 German snub nose revolver to use in the robbery and waited outside while Rogers and one other member of the foursome entered the store. Although the youths entered the store with the intention of robbing it, they were foiled in this attempt by the intervention of Hall, who followed them into the store and brought proceedings to a halt. As is often the case with rapidly occurring and exciting events, there were some minor differences in the testimony of the Government witnesses as to exactly how this took place.

The eyewitnesses all concurred that when the youths entered the store, August Bono, the owner, was in his office, which had windows permitting him to keep watch over the store. An employee, Arlene Mitchell, was seated at a desk directly in front of the office. Hall testified that when he entered the store, he saw two youths; one of them had his hand on a gun, and the other was talking with Miss Mitchell, pretending he wanted a can of blue paint. Hall continued:

> I walked up to the youth [with the gun] and I told him "Let's have it". He went for his gun, I threw him out the door.

Miss Mitchell testified on the other hand that when Hall came in, she heard him say, "Get out of here." According to Miss Mitchell, one of the boys went out behind Hall as he stepped inside the door, and Hall "grabbed the other one that I was showing the paint colors to and pulled him outside."

Michael Rogers, the youth with the gun, had still another version of what occurred. He said that it was he who inquired of Miss Mitchell about blue paint, and it was he who was looking at the color chart when Hall came in the door and told the two boys to get out. Rogers said that Hall grabbed him as he went out the door. Rogers' testimony differed from the others in one other way. Although Mr. Bono said that he did not leave his office during the aborted robbery, Rogers said that he did and that, when Rogers threatened him with the gun, Bono went "in the back."

It is undisputed that in a tussle with Hall outside the store, Rogers dropped his gun and then ran away. Hall testified that, during the tussle, Little started in Hall's direction with his hand in his belt where he had a gun. When Hall picked up Rogers' gun, Little turned and ran. Hall chased him to the other side of the street, at which point Little turned around with a gun in his hand. Hall grabbed the gun and subdued Little. When the police arrived, Little was lying on the floor of the restaurant with Hall sitting on his back.

## DISCUSSION

Section 14:27(A) of the Louisiana Revised Statutes provides:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

The Reporter's Comment under this section states that its "essential elements are an actual specific intent to commit the offense, and an overt act directed toward that end." However, "the overt act need not be the ultimate step toward, or the last proximate act or the last possible act in the consummation of the crime attempted." *State v. Williams*, 490 So.2d 255, 261 (La. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). The district court correctly rejected Little's argument

that he was not guilty of attempted armed robbery.

It is crystal clear that Little's youthful cohorts entered the paint store for the purpose of robbing it. In addition to the above-quoted remarks of Little that were overheard by Hall, Rogers testified repeatedly that this was their intent. When asked to identify the gun marked as Exhibit S–1, Rogers said:

A. That's the gun I had in my waistbelt.
Q. Where did you get this?
A. From Ronald Little.
Q. He gave this gun to you?
A. He gave that .22 German snub nose to me.
Q. What for?
A. To rob Mr. Bono's paint store.

Rogers testified at a later point that Little gave him the gun "right before we was going to rob Harrison Paint Store." When asked to identify the other gun, Exhibit S–2, Rogers said:

A. Ronald Little had it in his waistbelt.
Q. What for?
A. To rob Mr. Bono's paint shop.

Rogers later was asked what Little was doing while Rogers was in the paint store. He replied:

A. Ronald Little and his partner was standing in front the paint shop.
Q. And do you know why?
A. To watch the bus [business] so we could rob it.
Q. To watch the what?
A. Watch to see if any police cars come so we could rob the place.

Section 14:24 of the Louisiana Revised Statutes defines principals as "[a]ll persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." When Little sent his youthful cohorts into the store for the purpose of robbing it and then undertook to act as lookout, he was as much a participant in the unlawful proceedings as were the two he sent inside. Moreover, he had begun to

carry out his own role in the proposed robbery.

Under Louisiana law, the issue of criminal attempt generally is held to present a question of fact for the jury. *State v. Kelly,* 237 La. 991, 1004–05, 112 So.2d 687, 692 (1959); *State v. Carter,* 213 La. 829, 833, 35 So.2d 747, 748 (1948). Viewing the evidence in the light most favorable to the State, as we are required to do, *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979), we are satisfied that the jury, acting as rational factfinders, could readily find Little guilty of the crime for which he was indicted.

■ Little's second argument, that the State knowingly permitted Rogers to commit perjury when he testified that he had threatened Bono with a gun, is equally without merit. To prevail on this claim, Little was required to prove that the testimony actually was false, that the prosecutor knew it was false, and that it was material to the issue of the defendant's guilt. *Griffith v. United States,* 535 F.2d 320, 321 (5th Cir.1976). He proved none of the three.

As already pointed out, there were some inconsistencies in the testimony of the various witnesses inside the store. This is to be expected in stressful situations such as existed in the instant case. We agree with the district court that "[s]uch inconsistencies are for the trier of the facts, in this case the jury, to resolve...." *See United States v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976). We are not prepared to hold that the testimony of all the witnesses except Rogers was accurate and that, perforce, Rogers' testimony was false. *United States v. Branca,* 677 F.2d 59, 61 (11th Cir.1982). His testimony defied neither physical evidence nor the laws of nature. *United States v. De Los Santos,* 625 F.2d 62, 65 (5th Cir.1980); *United States v. Cravero, supra,* 530 F.2d at 670.

Moreover, assuming for the argument that Rogers' youthful imagination caused him to exaggerate his role as a macho, there is absolutely no proof that the prosecutor knew that this is what he was doing. Prosecutors cannot pick and choose accomplice witnesses such as Rogers but must take them as they come, with all their obvious failings. Consequently, prosecutors seldom are able to vouch for their credibility. For this reason, also, trial courts customarily instruct juries that the testimony of accomplice witnesses should be carefully scrutinized. *See, e.g., Tillery v. United States,* 411 F.2d 644, 646–48 (5th Cir.1969). Rogers testified that, at the time of trial, he was in a Louisiana Training Institute for Juveniles because of his participation in the very criminal conduct at issue herein and that he was brought to the courthouse by his commander on the day he testified. He said that the first and only time he met the prosecutor was that morning. Rogers did not testify voluntarily that he had threatened Bono. When asked by defense counsel whether he had threatened anyone in the store, Rogers said he didn't want to answer. It was only after the court ordered Rogers to answer that he disclosed his alleged threat to Bono. While the prosecutor may have viewed this testimony with some degree of suspicion, he was in no position to state categorically that it was false.

Finally, insofar as the issue of Little's guilt is concerned, we fail to see any prejudicial materiality in the disputed portion of Rogers' testimony. As already discussed, Little became a participant in the attempted armed robbery when he armed Rogers, sent Rogers and his colleague into the paint store for the purpose of robbing it, and began to carry out his own role as armed lookout. Indeed, unless police arrived on the scene, there was nothing further for Little to do to complete his self-assigned role in the armed robbery. Moreover, regardless of whether Rogers threatened Bono, it is clear that Rogers did not enter the store with a gun in his belt for the purpose of buying blue paint. As Rogers stood talking to Miss Mitchell, his situation was not unlike that covered by subparagraph (B) of section 14:27 which provides that "lying in wait with a dangerous weapon with the intent to commit a crime ... shall be sufficient to constitute an attempt to commit the offense intended."

Little's final argument, advanced only in his *pro se* brief and not in the brief of his assigned counsel, is that his sentence of twenty-five years without benefit of parole, probation or suspension of sentence is excessive and in violation of the Cruel and Unusual Punishment clause of the Eighth Amendment. The district court, following the teachings of *Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983), as this Court also has done, *Passman v. Blackburn,* 797 F.2d 1335, 1350–51 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1609, 94 L.Ed.2d 794 (1987), exhaustively reviewed the appropriate criteria for determining constitutionality and correctly rejected Little's argument. We see no need to do more than summarize what already has been said by the court below.

The maximum sentence for armed robbery in Louisiana is ninety-nine years without benefit of parole, probation or suspension of sentence. West's La.Rev.Stat.Ann. § 14:64. The maximum term for attempted armed robbery is directly related thereto, it being one-half of the longest term of imprisonment for the consummated crime, *i.e.,* 49.5 years without benefit of parole, probation or suspension of sentence. *Id.* § 14:27(D)(3). As this Court did in *Passman v. Blackburn, supra,* the district court examined Louisiana statutes covering a number of other violent crimes, *e.g., id.* § 14:30(C) (first degree murder); *id.* § 14:44 (aggravated kidnapping); *id.* § 14:42(C) (aggravated rape), and found the maximum sentence for armed robbery to be consonant with the maximum sentences for the other crimes examined.

The district court also compared the Louisiana maximum penalty for armed robbery with the maximum penalties for similar offenses in Mississippi (Miss.Code Ann. § 97–3–79); Texas (Tex.Penal Code Ann. §§ 29.03 & 12.32); Alabama (Ala.Code §§ 13A–8–41 & 13A–5–6); Arkansas (Ark. Code Ann. § 5–12–103); Florida (Fla.Stat. Ann. §§ 812.13(2)(a) & 775.082(3)(b)); Michigan (Mich.Comp.Laws Ann. § 750.529); Tennessee (Tenn.Code Ann. § 39–2–501) and Georgia (Ga.Code Ann. § 16–8–41(b)). He found these statutes to be consistently onerous. Moreover, it is not unusual for States which have "attempt" statutes to make the penalty for attempt one-half that for the consummated crime. *See, e.g.,* Idaho Code § 18–306(1); Cal.Penal Code § 664(1). \*

Little's sentence was only fifty percent of the maximum for attempted robbery. In view of Little's Fagan-like leadership of his juvenile colleagues, which almost resulted in two shootings, the district court did not err in holding that Little's sentence, only half of what Little could have received, did not constitute cruel and inhuman punishment. The judgment of the district court is

AFFIRMED.